THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ANTHONY SINGLETARY, a/k/a Bernard Berry, Defendant-Appellant.

First District (1st Division)   No. 77-1587

Opinion filed June 4, 1979.

Robert L. Edwards, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Carol A. Kearney, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

After a jury trial, Anthony Singletary, also known as Bernard Berry (defendant), was found guilty of the murder of Edward Zwolinski and aggravated battery of Geraldine Ciborowski. He was sentenced to concurrent terms of 30 to 90 years and 3 to 9 years for these offenses respectively. Defendant appeals.

Defendant's brief in this court raises 13 issues. This opinion will state the evidence, consider the issue of reasonable doubt and then consider each of the remaining issues in order.

Shortly after midnight of July 4, 1975, seven young men and women were together at a tavern on the west side of Chicago. They all left upon four motorcycles being driven by four young men. The three young ladies rode as passengers. They proceeded west on Blackhawk Street to Ashland Avenue. Geraldine Ciborowski was riding behind the deceased, Edward Zwolinski. Karen Quinn rode behind George Bawall and Diane Jenko rode behind Jerrold Battista. Armando Delgado rode alone. At Ashland Avenue the group made a left turn and proceeded south. As they went by the intersection of Ashland Avenue with Milwaukee Avenue, a diagonal street, they heard a group of noisy people congregated on the northeast corner. Geraldine Ciborowski observed a woman from the group chase a man and shout a racial epithet. After a stop for the traffic light at the intersection, the cyclists all continued south.

The next east and west intersecting street was Division Street. Armando Delgado and Jerrold Battista with Diane Jenko continued on south of Division Street. They then noticed that the remaining two cyclists were not behind them. They saw that their friends had made a right turn to proceed west on Division Street and were waiting for them at the

corner. Accordingly Battista and Delgado drove back in a northerly direction on Ashland Avenue and turned west on Division Street to join their friends.

There is testimony from George Bawall, who, accompanied by the deceased, was waiting for the other two motorcyclists to return, that a man identified as the defendant walked up to the group and asked who had addressed a racial slur to him. Bawall responded, "Nobody called you anything." By this time the two other motorcyclists had rejoined the group. Armando Delgado testified that he heard the question by the defendant to the deceased and that the deceased responded, "No one called you nothing." The defendant then drew a pistol and waved it at the group. Defendant walked over to Armando Delgado and pointed the gun at his head. Delgado testified that he told defendant, "Please, man, don't shoot. We are leaving." The defendant, with the use of a different racial slur, ordered the group to leave. None of the cyclists had left their machines. There is evidence that two women walked up behind the defendant and spoke to Diane Jenko.

All of the motorcycles then proceeded in a westerly direction on Division Street. Some members of the group heard four shots as they headed west. Geraldine Ciborowski testified she told the deceased she thought the defendant had fired some shots because a bullet went through her "pants." The deceased executed a U-turn with his motorcycle and then turned again to continue in a westerly direction. Two shots were fired. The deceased was hit and Geraldine Ciborowski attempted unsuccessfully to steer the motorcycle. It was struck by an oncoming vehicle. The deceased and Geraldine Ciborowski were thrown into the air.

Armando Delgado testified that when he heard the four shots he saw the defendant standing in the street with a gun in his hand. He saw the motorcycle of the deceased execute a U-turn then complete the circle and continue west. As the deceased was going west, Delgado heard two more shots and saw defendant pointing his gun at the group. He said that the defendant "was squatting aiming at us." Jerrold Battista testified he heard the four shots. He saw the defendant squat down and fire two more shots.

There is expert testimony that the fatal bullet entered the head of the deceased from the rear, slightly to the left of center. Geraldine Ciborowski spent more than one month in the hospital as a result of her injuries.

After the incident, one of the cyclists pointed out to a police officer the two women who had spoken to Diane Jenko. These ladies, Sylvia Moore and Debra Cooper, later accompanied police to their home located on Ashland Avenue slightly south of Division Street. Police found the defendant in the premises. Defendant was first seen crawling along

the floor and then crawling out of a window in the basement door. In due course defendant was taken into custody in the basement. That part of the premises was unlighted and the defendant was standing behind a pillar. The basement had a dirt floor and there were rags and junk in the area. There was no bed, stove or toilet. The police officers found another woman, Mabel Crowlin, and her daughter, Brenda Smith, in the premises. Mabel Crowlin took the officers to the second floor front apartment. The police entered a bathroom where a gun was found in a purse in the shower stall. The name of Mabel Crowlin appeared on papers in the purse. At the police station, after defendant had been properly warned, he told the police that he had not been on the corner of Division Street and Ashland Avenue that night but that he had been with Mabel Crowlin. He stated that he had not shot anyone.

A ballistics expert examined the gun recovered by the police and the fragments of the fatal bullet. In the opinion of the expert, it was impossible to state conclusively that the fatal bullet had been fired from the gun. The expert's opinion was that the bullet could have been fired from that gun but also could have been fired from similar guns made by four other manufacturers.

Defendant testified that he lived on the premises where he was arrested and that he had another apartment on the north side of Chicago. He paid rent in both places. He accompanied Mabel Crowlin, Sylvia Moore and Debra Cooper to two bars on the night in question. He saw about 15 people in a group on the sidewalk at the intersection of Ashland Avenue and Milwaukee Avenue. Some of these people were throwing firecrackers. Defendant and Debra Cooper went for a short walk alone and then they walked by the corner of Ashland and Division. As some motorcycles passed, defendant heard someone address a racial slur to him. He asked who had done so. The deceased stopped his motorcycle at the curb and denied that anyone had called defendant anything. Defendant told the deceased to leave but the deceased left his motorcycle and walked over to the defendant with his hand in his pocket. As the deceased approached to a distance of about 4 or 5 feet, the defendant drew his own gun from a holster. This was not the gun found by the police in the purse, which defendant testified he did not own.

Defendant then heard Geraldine Ciborowski request her group to leave. The four motorcycles all left in a westerly direction. Defendant and Debra Cooper started to walk across Division Street. Defendant saw two motorcycles about 50 to 100 feet away from him coming 60 to 70 miles an hour "directly at me." He recognized Zwolinski, the deceased, and Delgado on these bikes. He waited for 3 seconds. The machines increased their speed. They could have been going 80 or 90 or even 100 miles per hour. Defendant squatted down and pointed his gun at them. He waited

another 5 seconds. He then fired two shots. At that time he had his head down and his eyes closed and did not aim the gun at anyone. "I was pointing the gun in that direction." "At that time I did not know if I had shot anybody." He fired the gun because he was afraid of being hurt. The motorcycles then made a U-turn and went back west.

After firing the shots, defendant ran home. Part of the way he went down an alley and approached the apartment from a gangway. He threw his own gun away in the middle of Marshfield Avenue, which is the next street west of Ashland. He did not know the caliber or the manufacturer of that weapon. Defendant was living in the basement of the Ashland Avenue premises. Debra Cooper lived there with him. He had a foldaway cot in the basement in the room which had formerly been a coal bin.

■■ We will first consider the reasonable doubt issue and then, in order, the remaining points raised by defendant. The issue of reasonable doubt is readily decided contrary to the defendant's contention. Defendant admitted in his own testimony that he had fired two shots in the direction of two motorcycles speeding toward him. His theory was that he did not aim at the cyclists but shot with his eyes closed. The fact beyond dispute, as shown by the physical evidence here, is that the shots were fired while the cyclists were riding away from defendant. The testimony of the pathologist is that the entry wound from the fatal bullet was at the rear of the head of the deceased.

Defendant testified that he fired only two shots. On the contrary, three witnesses for the State heard shots as they were traveling away from the defendant. Defendant's testimony contains its own refutation in other particulars. His testimony is that he saw the motorcycles from 50 to 100 feet away from him and that some 8 seconds went by before he fired the shots. During this time interval the cyclists increased their speed from 60 to 70 to perhaps from 80 to 100 miles per hour. If the machines actually traveled at 80 miles per hour, this was equivalent to a speed of about 117 feet per second. Thus, they would have been long past the point where defendant was standing after an 8-second interval. Also, according to defendant's version of the facts, all of the cyclists left in accordance with the request of Geraldine Ciborowski and after defendant had pulled his gun. Since there was no evidence that any of the group was armed, it would seem incredible for two of their number to ride continuously and directly toward defendant whom they all knew had drawn a gun.

In addition, defendant apparently ran away after the occurrence and threw his gun away in the street. If he had acted in self-defense, this conduct would not have been reasonable. After defendant's flight he proceeded to secrete himself in the basement and to attempt an escape by the rear door. The gun identified as the one with which defendant was armed was found in a different portion of the same premises. Also,

defendant's initial statement to the police directly contradicted his testimony at trial. Serious doubts may well be raised regarding the veracity of defendant's testimony that he lived simultaneously in two apartments and paid rent for both. An issue exists as to the habitability of the basement room in which defendant was apprehended from a position behind a pillar. In short, the testimony of guilt in the instant case is beyond reasonable doubt to the point of being overwhelming.

We cannot set aside the verdict since the evidence presented at trial is definitely not "so improbable as to raise a reasonable doubt of guilt." (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 227, 367 N.E.2d 666.) There are areas of conflict in the testimony but the resolution of the resulting questions of fact and problems of the credibility of the witnesses are within the province of the jury. 67 Ill. 2d 222, 227.

## I.

Mary Paul was tentatively chosen as one of the jurors in a second panel of four. Next morning, before the panel was sworn, the assistant State's Attorney reported to the trial court that he had received a telephone call from a person purporting to be an attorney and the husband of Mary Paul. Mrs. Paul had stated on *voir dire* that her husband is an attorney and also that she had previously been the victim of a battery and burglary. The State's Attorney told the court that the husband stated that Mrs. Paul had told him that she wished to be a member of the jury and that she had been excluded from previous jury service because of her husband's profession.

The State's Attorney then requested that the juror be excused for cause. Defendant's counsel objected. After hearing argument the trial court excused the juror for cause. The trial court was of the opinion the incident demonstrated that the prospective juror reasonably might not be able to abstain from discussing the case with her husband. Counsel for defendant stated that there should be a hearing so that the juror's husband could be brought in to testify. The trial court denied this request.

This entire incident amounts to a determination by the trial court as to whether or not the prospective juror would be able to give the parties a fair and impartial trial. With apparent good reason the trial court excused the juror. This ruling rested "in the sound discretion of the trial judge. His determination should not be set aside unless it is against the manifest weight of the evidence." (*People v. Cole* (1973), 54 Ill. 2d 401, 414, 298 N.E.2d 705.) The result here reached was, in our opinion, well within reasonable discretion. Also, the entire incident did not present sufficient cause to expend the time and effort required in taking testimony of the prospective juror's husband and perhaps other persons. The result reached by the trial court was a practical solution of the problem.

■■ These questions which arise in connection with the selection and management of the jury raise myriads of problems with different aspects. It seems to us that the answers necessarily depend upon a determination of whether the right of the defendant to a fair trial was prejudiced by the ruling of the court. We find this matter of existence of prejudice used as a measuring stick by courts of review in varying situations. It appears in a case in which a juror made unintentional misrepresentations during *voir dire* (*People v. Rohwedder* (1969), 106 Ill. App. 2d 1, 245 N.E.2d 282). *People v. Harris* (1979), 74 Ill. 2d 472, 386 N.E.2d 60, refers to incidents involving an accusation by defendant of alleged misconduct by a juror during recess and subsequent conduct by the trial court which defendant sought to advance as a ground of prejudice. *People v. Rosenborgh* (1974), 21 Ill. App. 3d 676, 687, 315 N.E.2d 545, citing *Rohwedder*, deals with failure of a juror to disclose facts on *voir dire.*

Applying this test of prejudice, we find no evidence thereof in this record. Mere conjecture cannot be considered as a basis for a claim of prejudice. (*People v. Witherspoon* (1973), 55 Ill. 2d 18, 21, 302 N.E.2d 3.) Furthermore, it may well be urged that defendant improved his position with the discharge of this juror who had previously been the victim of two crimes.

II.

On April 27, 1976, the State filed a written answer to defendant's motion for discovery. The answer stated that a plat of the scene might or might not be offered into evidence. The answer also stated that this article and others mentioned would be made available to the defense for inspection before trial. There is no showing in this record as to whether defendant ever availed himself of the offer to inspect this exhibit.

Trial was not commenced until some 7 months later in November of 1976. After the plat, which reflected the scene of the occurrence, was received in evidence, defendant raised the point that the plat recited it was drawn to a scale of 1 inch equals 20 feet and that no witness had ever testified to that effect. The court then told defense counsel to take an opportunity to check the plat on the question of its accuracy. This incident occurred on Friday and the court told counsel for defendant that this check could be made until Monday before the case would be sent to the jury. There is no showing that such check for accuracy was ever made or that any further point regarding the plat was ever raised.

These facts show that the case before us is far different from *People v. Elston* (1977), 46 Ill. App. 3d 103, 360 N.E.2d 518, cited by defendant, in which important evidence was not revealed to the defendant before trial despite a discovery order by the trial court.

■■ On the question of accuracy of the exhibit, two witnesses for the

State testified that the plat was a true and accurate portrayal of the scene. Use of the plat with reference to the scale and distances did not appear to be necessary to the defense here in any regard. There is no showing or suggestion that the plat is inaccurate in any respect. The only material reference to distance is defendant's statement that he saw two of the motorcycles coming toward him at a distance of some 50 to 100 feet. Finally, as a general matter, the admission of demonstrative evidence is within the discretion of the trial court. (*People v. Lawrence* (1970), 126 Ill. App. 2d 202, 208, 261 N.E.2d 459.) We find no error in this regard.

### III.

■■ Some of the group of cyclists testified that when they left the defendant at his demand and proceeded west on Division Street, they heard four shots from behind them. Geraldine Ciborowski testified that she told the deceased that she thought defendant was shooting at them because one bullet "went through my pants." Armando Delgado testified that after hearing what sounded like four shots he turned around and saw the defendant with a gun in the middle of the street. Defendant urges that this testimony was conjecture and opinion testimony without factual basis. We disagree.

The fact that Delgado saw defendant with the gun in his hand after hearing the shots would appear sufficient basis for him to testify that he heard a gun shot. Also, the use of the words "gun shot" by these witnesses was in a sense descriptive as it would be impossible for them to attempt to duplicate the noise itself before the jury.

■■ There are many situations in which a nonexpert is permitted to give opinion testimony. As stated by this court, some of the situations are with reference "to the size, weight, color, and value of property, and to time, distance, speed, and the like, [citation]." (*People v. Burton* (1972), 6 Ill. App. 3d 879, 886, 286 N.E.2d 792.) Also, many authorities hold that a lay witness may testify to the speed of a vehicle and may describe it as "fast" or "slow." *Forney v. Calvin* (1975), 35 Ill. App. 3d 32, 39, 340 N.E.2d 603; *Ryan v. McEvoy* (1974), 20 Ill. App. 3d 562, 568, 315 N.E.2d 38.

■■ In this regard, defendant also attacks the testimony of the firearms expert called by the People. This expert examined the handgun which had been recovered by the police from the shower room of the apartment on Ashland Avenue. He also examined the mutilated fatal bullet and gave the opinion that the bullet might have been fired from that gun but also could have been fired from similar weapons made by four other manufacturers. We do not find this testimony of the expert was conjecture and speculation as defendant claims. Apparently it was as definite a statement as any expert could formulate in view of the facts at hand. We find no issue here regarding admissibility of this opinion of the expert.

The weight and the value of this testimony "largely depends on the foundations of fact and reason upon which the opinions stand." (*Cannell v. State Farm Fire & Casualty Co.* (1975), 25 Ill. App. 3d 907, 912, 323 N.E.2d 418.) The matter of the weight to be given to the opinion of the ballistics expert was therefore a matter to be determined by the jury.

## IV.

Defendant urges that his cross-examination of Geraldine Ciborowski, prosecuting witness in the aggravated battery charges, was restricted by the trial court. Defendant states that the trial court in effect prevented him from establishing a proper foundation for impeachment of the witness by a prior inconsistent statement given to Police Officer Lamega. We disagree.

On cross-examination of the witness, counsel for defendant elicited the fact that she had occasion to talk to some police officers while she was in the hospital. She did not recollect if the officers were in plain clothes. She could not recognize the officer now. She did not recall the officer at all. After a side-bar conference, the trial court suggested that counsel ascertain from the witness again if she had any recollection of any conversation and then terminate that particular line of examination. The attorney then inquired and the witness responded that she did not recall any conversation she had with a police officer in the hospital. The attorney went on to other matters of cross-examination. No question was put to the witness regarding her recollection as to any particular statement she may have made and the matter terminated there.

■■ In defendant's brief, his counsel refers in this regard to another portion of the record. We find that this involves testimony of Officer Lamega on direct examination when he was called as a witness for defendant. It appears that Officer Lamega had a police report regarding the occurrence but he had no verbatim or substantially verbatim statement from the witness Geraldine Ciborowski. (See *People v. Matthews* (1972), 7 Ill. App. 3d 1059, 1063, 289 N.E.2d 98, *appeal denied* (1973), 53 Ill. 2d 604.) Counsel for defendant also sought to discredit Officer Lamega with a transcript of the officer's testimony before the coroner's inquest. That testimony contains nothing said by Geraldine Ciborowski but only by Mr. Lamega. This could not be used by way of impeachment of Geraldine Ciborowski. See *People v. Colon* (1974), 20 Ill. App. 3d 858, 865, 314 N.E.2d 664.

■■ Thus, the problem of the defense in this regard was not an adverse ruling by the trial court. Since the witness did not remember the making of any statement to the officer, there was a foundation for her impeachment depending upon the character of the allegedly inconsistent statement. (See *People v. Bush* (1963), 29 Ill. 2d 367, 372, 194 N.E.2d 308.)

But, it does not appear that Officer Lamega actually had possession of any proper statement by the witness which could conceivably be construed as impeaching.

## V.

On the direct examination of Police Officer Dudycz, the State's Attorney inquired as to the purpose of the officer "in going up with Brenda Smith to the second floor apartment" where the purse containing the gun was found. Counsel for the defendant objected on the ground that this sought to inquire into a mental function. The trial court overruled the objection and the witness answered, "to retrieve the murder weapon \* \* \*." The trial court thereupon stated that he would sustain the objection as to the description of the gun and then decided to strike the entire question and asked the jury to disregard it. The court then again admonished the jury to disregard that answer with use of the same language. The State urges that this testimony by the officer was not improper since he stated only that he had gone to retrieve the murder weapon and did not directly state that the gun he recovered actually was the fatal weapon.

In our opinion, we need not pass upon these various theories. We find the trial court acted properly in striking out "the murder weapon" from the testimony of the officer. We further find that "[d]efendant's prompt objection and the trial court's action in sustaining the objection served to cure the error complained of." *People v. Martinez* (1978), 62 Ill. App. 3d 7, 16, 377 N.E.2d 1222, *appeal denied* (1978), 71 Ill. 2d 612, citing *People v. Howard* (1976), 42 Ill. App. 3d 81, 355 N.E.2d 543.

## VI.

The trial court permitted proof of defendant's prior convictions for aggravated battery and for unlawful use of a weapon. Both of these crimes were committed within 10 years of the offense in the instant case. The conviction for unlawful use of a weapon occurred less than 5 years after the conviction for aggravated battery. Therefore, both of these previous convictions were felonies. See Ill. Rev. Stat. 1975, ch. 38, par. 24—1; also Ill. Rev. Stat. 1975, ch. 38, par. 12—4.

Defendant urges that these convictions did not reflect upon his veracity but were simply prejudicial. Under the guidelines established in *People v. Montgomery* (1971), 47 Ill. 2d 510, 515, 268 N.E.2d 695, this "question is inherently judicial, and we believe that view is correct which places the discretion as to the admissibility of this kind of evidence in the judge rather than in the prosecutor." The *Montgomery* court then proceeded to state the guidelines which included the time limit of less than 10 years from the offense on trial; the previous offenses were punishable by imprisonment in excess of 1 year or involved dishonesty or

false statement; and also a determination by the trial court as to whether "the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice." *Montgomery*, 47 Ill. 2d 510, 516, quoting from Rule 609 of the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States.

In our opinion, in the instant case the use of the previous felony offenses for impeachment was justified by compliance with each and all of these requirements. The statements made by the trial court in considering the admissibility of the previous convictions "indicate that he exercised his discretion in determining that the probative value of these convictions was not substantially outweighed by the danger of unfair prejudice." *People v. Sanders* (1976), 37 Ill. App. 3d 236, 238-39, 345 N.E.2d 757.

We do not find *People v. Wright* (1977), 51 Ill. App. 3d 461, 366 N.E.2d 1058, which defendant cites and relies upon, applicable here. The majority opinion there pointed out that the defendant was on trial for a sex offense and the two previous convictions for aggravated battery became classified as felonies only "because in one case the offense occurred in a public place and in the other the victim was a policeman." (51 Ill. App. 3d 461, 464.) In the case before us the two previous offenses are directly linked to the issues of credibility. Upon the entire record before us, we agree that their probative value is far greater than the danger of unfair prejudice.

## VII.

■■ Defendant urges that the trial court improperly permitted cross-examination on prior arrests of the defendant. Defendant's brief refers to one portion of the record in this regard. On cross-examination of the defendant, the State's Attorney asked, "Have you ever been found in possession of a gun?" The trial court overruled an objection by defense counsel. The defendant answered negatively. The State's Attorney then stated, "Question withdrawn." We cannot equate this question with cross-examination concerning a prior arrest; nor do we find that the incident constitutes reversible error in the case before us.

■■ Defendant next urges here that the trial court improperly permitted him to be cross-examined as to whether police officers had committed perjury in their testimony. In this regard, the reference to the record in defendant's brief showed that on cross-examination the State mentioned the testimony of various police officers. The next question regarding one of those officers was, "He must have lied then." The objection was overruled and the witness answered, "I am not going to call the officer a liar, no." The next page of the record shows the use of the word "lied" once more by the State's Attorney but on this occasion the trial court

sustained the objection and the question was never answered. We find no error relating to this incident.

## VIII.

Defendant contends that on cross-examination of Armando Delgado as a prosecution witness, the State requested the defense to submit to the jury a police report that the defense was attempting to use as impeachment. What actually occurred is that the State's Attorney said, "I object to the statement being read unless the whole statement is read to the jury." The defendant describes this as an attempt to introduce police reports into evidence. Defendant also states that on redirect examination of the witness the State's Attorney asked him to read the statement to the jury in its entirety. However, counsel for the defendant objected to this procedure and the court sustained the objection. The police report was thus never read to the jury but was simply used by both sides as the basis for an attempted impeachment which was not successful and a start of an attempt at unnecessary rehabilitation of the witness by the State which was prevented by the trial court.

## IX.

■■ Defendant contends that he was denied a fair trial by irrelevant and immaterial questions on his cross-examination. Without detailing each of the individual questions, it is sufficient to say that they covered the following:

(1) The identification or designation of defendant to the police as the person who had fired the shots by Sylvia Moore and Debra Cooper. These were the ladies pointed out after the incident by one of the cyclists. They accompanied the police to their home where defendant was arrested.

(2) Defendant was questioned as to whether he had ever ridden on the back of a motorcycle and if he had anything against people who ride motorcycles.

(3) How long Debra Cooper had been defendant's girlfriend prior to the time that he heard someone address a racial epithet against him and also as to whether or not this had angered the defendant.

We cannot say that these questions may be considered as demonstrating the fairest attitude by a prosecutor. However, we cannot say that they were of the type or extent involved in *People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353, cited and relied upon by defendant. The opinion there detailed pages of "prejudicial and unsupported insinuations" which were patently contrary to fairness. (43 Ill. 2d 375, 394,

see also 383.) In view of the wide limits of discretion vested in the trial court in this type of situation (*People v. Williams* (1977), 66 Ill. 2d 478, 486-87, 363 N.E.2d 801), and in view of the strong evidence presented in this entire record, we do not find reversible error in this regard.

### X.

Defendant claims reversible error based upon final argument of the State's Attorney:

(1) The prosecution misstated the evidence of Geraldine Ciborowski with reference to the holes in her "pants" from a bullet and argued that Mabel Crowlin was uncooperative with the police because she lived with the defendant.

(2) The State's Attorney gave a reason, not shown in the record, as to why the defendant did not tell the police he fired a gun at the time of the offense.

(3) The State said that all of their witnesses heard four shots but the evidence showed that only two heard noises they believed were shots.

(4) The State's Attorney asked the jury to compute the distance that the motorcycle could have traveled in 9 seconds at the rate of 60 to 100 miles per hour.

(5) The argument of the State appealed to passion and sympathy of the jury by statements such as to find defendant not guilty the jury would have to ignore the law and the evidence and throw them out of the window.

(6) The State's Attorney improperly argued to the jury the instructions they would receive from the court.

(7) The prosecutor expressed his opinion as to the guilt of the defendant.

As regards number 6 above, the trial court promptly sustained an objection by defendant's counsel and instructed the jury to disregard the statements about the instructions. Therefore, we find no infringement upon the defendant's rights in that regard particularly in view of the strong evidence of guilt. *People v. Salazar* (1976), 37 Ill. App. 3d 800, 805, 347 N.E.2d 86, citing *People v. Skorusa* (1973), 55 Ill. 2d 577, 585, 304 N.E.2d 630.

As to the remainder of the points raised, we have read and considered all of the final arguments. We conclude that there was no prejudicial error here because the final argument of the State did not constitute " 'a material factor in the conviction * * *' " (*People v. Clark* (1972), 52 Ill. 2d 374, 390, 288 N.E.2d 363, quoting *People v. Swets* (1962), 24 Ill. 2d 418, 423, 182 N.E.2d 150), resulted in "substantial prejudice to the accused" (*People v. Nilsson* (1970), 44 Ill. 2d 244, 248, 255 N.E.2d 432,

*cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881), or "the verdict would have been different had the improper closing argument not been made \* \* \*" (*People v. Trice* (1970), 127 Ill. App. 2d 310, 319, 262 N.E.2d 276). "Finally, we must consider the fact that 'both the court and counsel admonished the jury that counsel's remarks did not constitute evidence.' (*People v. King* (1977), 66 Ill. 2d 551, 559, 363 N.E.2d 838.)" *People v. Smith* (1977), 53 Ill. App. 3d 395, 404, 368 N.E.2d 561.

## XI.

During deliberation of the jury, the court received a request for copies of the testimony of Geraldine Ciborowski and Armando Delgado. The court denied this request and told the jury that there were no transcripts available and that the jurors should rely upon their recollection of the testimony in the case.

The courts of Illinois have held that the allowance or refusal of a request by the jury for a transcript of testimony in connection with its deliberation is within the discretion of the trial court. (*People v. Pierce* (1974), 56 Ill. 2d 361, 364, 308 N.E.2d 577.) However, a request of this type may not be summarily rejected. The ruling by the trial court is required to be a product of the exercise of discretion. *People v. Autman* (1974), 58 Ill. 2d 171, 317 N.E.2d 570; *People v. Queen* (1974), 56 Ill. 2d 560, 310 N.E.2d 166.

■■ We find here that the trial judge exercised his discretion and denied the request by the jury on that basis. The trial judge stated that if he gave the jury testimony of these two witnesses only, the jury might tend to single out that particular testimony and thus create a problem. We find the discretion of the trial court was properly exercised in this regard.

■■ Defendant urges that the decision of the trial court was arrived at while the defendant was not present in court. The same point was raised in *Pierce* and rejected by the supreme court on the ground that since no substantial rights of the defendant were involved, his presence was unnecessary. 56 Ill. 2d 361, 365.

## XII.

Defendant finally urges that the trial court erred in giving the jury a deadlock instruction such as that provided in *People v. Prim* (1972), 53 Ill. 2d 62, 71-72, 289 N.E.2d 601. This contention apparently results from a misunderstanding. The report of proceedings before us does not show that a *Prim* instruction was given to the jury. The confusion results from the fact that there is a copy of a *Prim* instruction contained in the common law record. This instruction bears the handwritten designation "First Trial." A former trial of this case led to a mistrial, therefore, it would seem

clear that this instruction was not given in the trial which is the subject of this appeal but was given during the previous proceedings.

For the above reasons the judgment appealed from is affirmed.

Judgment affirmed.

McGLOON and CAMPBELL, JJ., concur.