THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DAVID THOMAS, Defendant-Appellant.

First District (5th Division)    No. 79-780

Opinion filed October 3, 1980.

James J. Doherty, Public Defender, of Chicago (Clifford G. Kosoff and Timothy O'Neill, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Pamela L. Gray, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of the offenses of armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2), burglary (Ill. Rev. Stat. 1975, ch. 38, par. 19—1) and unlawful restraint (Ill. Rev. Stat. 1975, ch. 38, par. 10—3) and sentenced to four to 12 years in the penitentiary solely on the armed robbery conviction. On appeal, he contends that: (1) the trial court erred in denying his motion to suppress evidence discovered as a result of a warrantless search; (2) he was denied a fair trial when the trial court failed to ask prospective jurors questions during *voir dire* sufficient to allow him to intelligently exercise his peremptory challenges; (3) the prosecutor erroneously commented on his decision not to testify; (4) evidence that defendant was a narcotics user was improperly admitted at trial; and (5) the State failed to prove that he was guilty beyond a reasonable doubt.

On May 10, 1977, Virgil Winston was in his apartment at 2631 S. Indiana, Chicago. At about 3 that afternoon, his 15-year-old granddaughter, Monica Booth, stopped by. After he gave her money to purchase cigarettes, she left. Booth returned about 15 minutes later wearing a mask over her face. Winston recognized her because of her shoes, which he knew her mother had purchased. According to Winston, Booth was accompanied by defendant, who was five feet tall and wore a blue vest. Defendant placed a knife against Winston's neck, hit him on the shoulder with his fist and told him to "get down" off the couch and onto the floor. Then, defendant tied Winston's arms and legs with a telephone cord and put a handkerchief in his mouth. During this time, Winston, while kneeling on the floor, was looking up into defendant's face. Winston also saw his granddaughter rummage through his dresser drawer and remove his wallet containing $350. Later, he discovered that a watch, a chain, a gun, a diamond ring, and a ring with the initials "V.W." were also taken during the incident.

Shortly thereafter, Chicago Police Officers Markham and Coffey investigated the scene of the robbery. Markham testified that when he and his partner Coffey arrived, Winston was seated on the couch with his clothes ruffled, breathing heavily. The telephone was pulled out of the

wall and the entire apartment was in disarray. Winston told the officers that one of the assailants was his granddaughter, Monica Booth, and the other was a male, approxiamtely 20 years old. He was unable to give a more elaborate description of the male offender because the occurrence "happened so fast."

Also investigating the robbery was Chicago Police Officer Foulkes. On May 12, 1977, two days after the incident, he interviewed Winston at the victim's apartment and later spoke to Gwendolyn Booth, Winston's daughter and the mother of Monica Booth. Following these conversations, Foulkes proceeded to room 12 of the Dorchester Hotel, located at 75th and Dorchester, and arrested Monica Booth and defendant. Pursuant to the arrest, Foulkes recovered a ring bearing the initials "V.W.," a stone-studded ring, a watch, a watch-type compact on a chain and a gun. On May 13, 1977, Foulkes conducted a lineup at the police station at which Winston identified defendant. Prior to the lineup, Winston saw Monica Booth and defendant together as they arrived at the police station. At that time, Gwendolyn Booth informed Winston that defendant was the one who "runs around" with his granddaughter.

Monica Booth, testifying for the defense, stated that on May 10, 1977, she was living in a room she had rented at the Dorchester Hotel. She admitted that she robbed her grandfather that afternoon and stated that defendant was then and currently remained her boyfriend. However, the man who assisted her in committing the crime that day was not defendant, but a man named John Stewart. According to her testimony, both she and Stewart wore hats over their faces during the robbery which only exposed their eyes. The two took a gun, two rings, a charm and $285 in cash from Winston. When they left the scene, she gave Stewart $100, and returned alone to the hotel room where she placed the remaining items taken from her grandfather. Later that afternoon, defendant visited her at the hotel, but she neither told him then nor at any time prior to their arrest about the incident.

Defendant initially contends that the trial court erred in denying his motion to suppress the physical evidence alleged to be illegally seized during the search of the hotel room.

At the hearing on the motion to suppress, Officer Foulkes testified that during his investigation of the robbery, he interviewed Winston and obtained a description of the male offender as being a young black between 19 and 23 years old, 5′8″ tall, dark complected, with long hair and a slim build. Winston told Foulkes that his granddaughter was with this man. Foulkes and his partner then proceeded to the Dorchester Hotel on May 13, 1977, and discovered from the hotel clerk that Monica Booth and defendant were in room 12 of the hotel. They went to the room, announced their office and asked the occupants to open the door. Neither

had an arrest or search warrant. After being allowed entry, Foulkes observed Booth, defendant and an unidentified male in the 10′ x 12′ room. On a dresser in the room was an initial ring which matched the description of the one Foulkes knew was taken in the robbery. Foulkes then arrested Booth and defendant. Along with the initial ring, Foulkes recovered a wristwatch, a pocketwatch, another ring, some money and a gun. Some of these objects were found inside a closed dresser drawer, but Foulkes could not recall the location of each particular item. At the conclusion of this hearing, the trial court denied defendant's motion to suppress the evidence, ruling that the search was proper.

It is defendant's assertion that the search, which was incident to a lawful arrest, was an unreasonable one because it exceeded the area of the arrestee's "immediate control." *Chimel v. California* (1969), 395 U.S. 752, 763, 23 L. Ed. 2d 685, 694, 89 S. Ct. 2034, 2040.

■■ We note at the onset that defendant offered no testimony at the hearing that the hotel room was rented by him or that he had a possessory interest in the room or in the dresser where the items were found. In fact, testimony at trial showed that the room was rented exclusively by Monica Booth. A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his fourth amendment rights infringed. (*Rakas v. Illinois* (1978), 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421.) The capacity to claim the protection of the fourth amendment depends upon whether one has a legitimate expectation of privacy in the invaded place. (*Rakas.*) Since defendant has failed to show that he had any legitimate expectation of privacy in the searched premises, he has not met the threshold requirement of standing to challenge the legality of the search. Therefore, we need not decide whether the search was lawful. Moreover, the admission of the fruits of the search into evidence does not prejudice defendant regardless of the legality of the search, because the location of the items at the hotel was consistent with his theory of defense. Monica Booth testified that after she and Stewart robbed her grandfather, she placed the proceeds at the hotel room without defendant's knowledge. Certainly, the discovery of these items in the room only corroborates Booth's testimony and does not suggest that defendant aided her in the robbery or was ever aware of the existence of the property taken.

Defendant next contends that the trial court abused its discretion by failing to ask prospective jurors questions during jury selection which were sufficient to allow him to intelligently exercise his peremptory challenges.

Jury selection was conducted entirely by the trial court. Prior to *voir dire*, defendant's attorneys objected to this procedure and requested that

they be allowed to speak personally to prospective jurors in order to determine whether defendant would receive a fair trial. This request was denied. Defendant's attorneys also submitted to the trial court a list of 44 questions containing several subquestions to be used in probing the juror's ability to be fair and impartial. The trial court allowed the questions to be filed, but refused to ask any of them to prospective jurors with the exception of basic foundation questions (*i.e.*, name, age, residence, etc.). Throughout the entire jury selection proceedings, defense counsel made several objections to the type of questions that were posed by the trial court and requested at side-bars that other specific questions be asked particular jurors. The court refused each and every one of these requests. When defense counsel made motions challenging various jurors for cause following the trial court's refusal to ask suggested questions, they were denied. Defendants' attorneys were ultimately required to utilize peremptory challenges to exclude several of these prospective jurors.

Defendant cites the following passage of the court's examination of a prospective panel of jurors as illustrative of its failure to conduct an inquiry sufficient to allow him to intelligently exercise his peremptory challenges:

"THE COURT: Swear the panel to try the issues.

(The panel was duly sworn to try the issues.)

THE COURT: You may be at leisure.

You have been listening to me, you last four, for almost four hours and you had an hour at lunch.

THOMAS O'DONNELL, a prospective juror, having been first duly sworn to answer questions, was examined as follows:

EXAMINATION BY THE COURT:

Q. Thomas O'Donnell, 6555 West Addison Street, and you are a supervisor at Standard Brands.

I am not going to go through every question. Is there any reason that you can think of, after hearing these maybe a hundred questions or more, is there any reason you can think of on the things I asked everybody else so that you couldn't give both sides a fair trial after sitting there all of this time and knowing what we are trying to look for?

Is there any reason you think of that you cannot give both sides a fair trial?

A. No.

Q. Would you like to serve on this jury?

A. Yes.

VALERIA GRUSZKA, a prospective juror, having been first duly sworn to answer questions, was examined as follows:

### EXAMINATION BY THE COURT:

Q. Valeria Gruszka, 4848 South Sawyer?

A. Right.

Q. A mail clerk for the American Can Company?

A. Yes.

Q. You have been here in the courtroom for an hour and a half this morning, close to four hours plus your lunch hour. Is there anything that I have asked about a victim of a crime, former jury service, any reason I have asked all these other people that you would want to add where you could show you couldn't be a fair juror to both sides?

A. No, there isn't.

Q. Would you like to sit on this jury?

A. Yes, I would.

The Court: I am doing this because you people have heard every question I have asked.

THOMAS O'DONNELL, a prospective juror, having been previously duly sworn to answer questions, was examined further as follows:

Juror O'Donnell: We are going through this list of questions and if I have anything that I should volunteer, I should volunteer?

### EXAMINATION (RESUMED) BY THE COURT:

Q. Yes.

A. I have a cousin with rank in the Chicago Police Department.

Q. Thank you very much. Just because he is in rank—

A. That makes no difference.

Q. You are telling me even though you have this relative, you would still give both sides a fair trial, is that right?

A. Yes.

HAMP JONES, a prospective juror, having been first duly sworn to answer questions, was examined as follows:

### EXAMINATION BY THE COURT:

Q. Hamp Jones, 10635 South Edgebrook, utility man with the Grace Corporation. What is the Grace Corporation?

A. They produce material for construction.

Q. Construction work?

A. They produce material for construction.

Q. You are a utility man for them, is that right?

A. That is right.

Q. Hamp, you have been sitting there listening to all these questions from all the other people, the eight people sworn in plus maybe fifteen or twenty-five people who got up and walked out

and people who were excused; and is there anything you can think of why you couldn't give both sides a fair trial?

A. No.

Q. Would you like to sit on the jury?

A. I would like to.

MADALENE WASHAUSEN, a prospective juror, having been first duly sworn to answer questions, was examined as follows:

### EXAMINATION BY THE COURT:

Q. Madalene Washausen, 220 Elizabeth Street, Calumet City, and you are retired and you are a widow?

A. Yes sir.

Q. You have been sitting there for four hours hearing these hundred of questions and my opening statements, and is there anything at all that you would like to tell us?

A. No, sir.

Q. As the other gentlemen did?

A. Not a thing.

Q. You think you can give both sides a fair trial?

A. Yes, sir.

Q. Do you wish to serve on this jury?

A. Yes, sir.

Q. What is that?

A. Yes, sir.

The Court: All right.

(The following proceedings were had out of the presence and hearing of the prospective jurors:

Mr. Kelly: (the prosecutor): Your Honor, the State will excuse Hamp Jones and accept the rest.

Mr. Mash: (defense counsel): *What a joke. Who is Hamp Jones, Madelene Washausen, Valeria Gruszka and Thomas O'Donnell? At this time I would be making a motion for mistrial on behalf of Mr. David Thomas. I think the way this last panel has been voir dired is completely out of bounds of any supreme court case.*

The Court: *Okay.*

Mr. Mash: *We don't know anything about these people, whether they have been the victims of a crime or not.*

The Court: *They all said they would tell me what they heard two hundred times, and they said they would give a fair trial. One man volunteered that he had somebody on the police department.*

Mr. Mash: *Could I find out who that is?*

The Court: *No. He said it doesn't make any difference. Under oath he said that. What else?*

Mr. Mash: *May we take a look at the cards for a moment to find out some facts I don't know about?*

The Court: *I read all the facts on the cards that I can read.*

Mr. Mash: *Your honor is denying my motion for mistrial?*

The Court: *Of course.*" (Emphasis added.)

■■ The right to a jury trial guarantees to one accused of a crime a fair trial by a panel of impartial jurors. (*People v. Cole* (1973), 54 Ill. 2d 401, 298 N.E.2d 705.) The determination of whether a prospective juror possesses the state of mind which will enable him or her to give the accused a fair and impartial trial rests within the sound discretion of the trial court. (*People v. Singletary* (1979), 73 Ill. App. 3d 239, 391 N.E.2d 440.) In making this determination, the trial court:

"* * * shall conduct the voir dire examination of prospective jurors by putting to them questions it thinks appropriate touching their qualifications to serve as jurors in the case on trial. The court may permit the parties to submit additional questions to it for further inquiry if it thinks they are appropriate, or may permit the parties to supplement the examination by such direct inquiry as the court deems proper. * * *" Ill. Rev. Stat. 1977, ch. 110A, par. 234.

Defendant concedes that the trial court has a great deal of discretion in conducting *voir dire* and makes no claim of a right to examine the jurors on his own. Defendant maintains, however, that the court's consistent refusal to ask probative questions amounts to an abuse of discretion and denied him the right to intelligently utilize the peremptory challenges secured by section 115—4 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 115—4). We agree.

Our supreme court, in commenting on the scope and extent of the *voir dire* examination has stated:

"It has never been suggested that a reasonable limitation on *voir dire* examination operates to deprive a litigant of his right to a jury trial. *However, a failure to permit pertinent inquiries to enable a party to ascertain whether the minds of the jurors are free from bias or prejudice which would constitute a basis of challenge for cause, or which would enable him to exercise his right of peremptory challenge intelligently, may constitute reversible error.*" (Emphasis added.) (*People v. Lobb* (1959), 17 Ill. 2d 287, 300, 161 N.E.2d 325, 332. See also *Gasiorowski v. Homer* (1977), 47 Ill. App. 3d 989, 365 N.E.2d 43; *People v. Carruthers* (1974), 18 Ill. App. 3d 255, 309 N.E.2d 659.)

The record in the instant case is replete with instances where the trial court failed to ask pertinent and analytical questions, over defense counsel's objections, after an area of a venireman's potential bias was uncovered. These repeated refusals deprived defendant of his right to

intelligently exercise his peremptory challenges. For example, during the *voir dire*, one prospective juror stated that her father, a Chicago police officer, died when she was young. The trial court denied defense counsel's request for the court to inquire as to whether he died of natural causes or during the course of his duties. Defense counsel was prevented from learning from another juror, who mentioned that her house had been burglarized, whether anyone was arrested. Finally, the court refused to ask several prospective jurors whether they would follow the law regardless of whether they agreed with it. Each of these questions was probative and relevant in determining whether the jurors would be fair and impartial.

The trial court erroneously felt that the single, dispositive question which served as a litmus test for a juror's objectivity was whether he or she could be fair to both sides during the trial. While the statement of a juror as to his or her ability to be fair and impartial is proper for the court to consider as evidence of the juror's state of mind *(Cole)*, it does not alone determine a juror's eligibility. In *United States v. Lewin* (7th Cir. 1972), 467 F.2d 1132, Judge Pell warned of the dangers of conducting a cursory selection process based solely upon general questions similar to those used in the present case:

> "We do not consider the court's obligation to let counsel, on request, get at underlying bases reflecting on bias, prejudice or other suspect factors to be discharged by general questions such as, 'Is there any reason you cannot fairly and impartially try this case?' This obligation particularly would not seem to be discharged by general direct confrontation questions on human characteristics that most people are reluctant to admit they possess." *Lewin*, 467 F.2d 1132, 1138.

The State argues that defendant has suffered no prejudice from the manner in which the jury was selected because certain jurors were accepted while defendant had peremptory challenges remaining, while other jurors whose qualifications were disputed were eventually excused. In addition, defendant failed to challenge the specific qualifications of any juror who served.

These arguments are unconvincing. It would be impossible to now enumerate the failings of a particular juror when defendant was effectively denied the opportunity to ascertain these very facts during the *voir dire*. In addition, no purpose would have been served if defendants' attorneys had summarily rejected suspect jurors during the selection process by the uninformed use of peremptory challenges when those jurors, upon further questioning, may have proven to be qualified candidates. In any event, the record shows that prejudice resulted to defendant during the selection of the final panel of jurors. Defendant

exhausted all of his peremptory challenges before the final panel was selected. Defense counsel attempted to excuse one of the jurors for cause but was forced to accept her due to the lack of peremptory challenges. This juror could have been excused by defendant if defense counsel had not been earlier forced to utilize peremptory challenges on the jurors previously discussed. In conclusion, we find that the manner in which the jury was selected did not allow defendant an opportunity to adequately form a basis as to the possible bias and prejudices of the prospective jurors. The trial court's failure to elicit pertinent information from the jurors denied defendant the intelligent exercises of his peremptory challenges and resulted in error.

Defendant also contends that he was denied a fair trial when the prosecutor commented on his decision not to testify.

Monica Booth, the sole defense witness, testified during the State's case-in-chief as a result of scheduling problems. During cross-examination, the prosecutor questioned her about a letter written by defendant to her which stated in part: "It's up to you to get me off this case." On redirect examination the following exchange occurred between the witness and defense counsel:

"DEFENSE COUNSEL: Monica, you're the only person who can come into court and tell the ladies and gentlemen of the jury who did the robbery, correct?

PROSECUTOR: Objection.

THE COURT: No. That's entirely different question.

PROSECUTOR: Objection, judge. There's another person who could do that.

*　*　*

PROSECUTOR: There's another person in this courtroom who can tell us what happened.

DEFENSE COUNSEL: Judge, side-bar.

*　*　*

DEFENSE COUNSEL: I make a motion for a mistrial.

THE COURT: Denied.

DEFENSE COUNSEL: It's so obvious that the attorney was inferring to that jury that the only person who could tell us who didn't do it is David Thomas, the defendant himself."

■■ Defendant asserts that the prosecutor erroneously impressed upon the minds of the jury by the comment that defendant could, if he so desired, be sworn and testify on his own behalf.

A defendant in a criminal case has the absolute right to choose not to testify in his own behalf without fear of prosecutorial comment on his decision. (*Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229; Ill. Rev. Stat. 1975, ch. 38, par. 155—1.) The test of whether the

comment is aimed at highlighting defendant's failure to testify is simply this: has the prosecutor suggested to the jury that its attention should be focused on the defendant's failure to take the stand? (See *People v. Connors* (1980), 82 Ill. App. 3d 312, 402 N.E.2d 773.) In the present case, the comment was made during the testimony of the sole defense witness. At this time, the prosecutor had been put on notice by defense counsel that defendant would not take the witness stand. Therefore, the only possible harmless interpretation that can be given the prosecutor's statement is that it referred to the victim, Virgil Winston, as the other person in the courtroom who could identify the male assailant. Our review of the record, however, fails to show that Winston was present in the courtroom when the statement was made. At the hearing on the motion for a new trial, the prosecutor stated that although Winston was not in the courtroom at the time of the comment, he was present for most of the trial, and the jury could therefore infer that the statement referred to him. In contrast, the trial court opined at the conclusion of this hearing that the statement erroneously referred to defendant but that the harmful effects of this reference were cured by an admonishment to the jury along with an instruction given at the end of the case. The court stated:

> "I think you [defense counsel] have a right to argue [that the comment constitutes error] because I severly criticized him, I said it was within an inch of a mistrial. I don't know if I made a mistake or not and I admitted it but the trial was so far along that I wanted to attempt to try to save it and I think I came out and I told them that and I think we gave them a special instruction, we know the defendant doesn't have to testify, and I think at the beginning of the time I say a presumption of innocence is there, he never has to do anything. I tried to have that overcome the implication of what [the prosecutor] said."

The jury was not admonished in any manner after the statement was made. However, an instruction was later given to the jury which stated that defendant's failure to testify was not to be a factor in arriving at their verdict. We find that this instruction was not sufficient to overcome the damaging effects of the prosecutor's reference to defendant's failure to testify. As early as 1882, the Illinois Supreme Court recognized the prejudicial impact that an allusion to a defendant's silence may have on a jury:

> "It is, perhaps, not easy to say how courts can best enforce this proviso forbidding allusion or reference to the fact of the neglect of the accused to testify. Though the court may promptly arrest remarks of this kind, and even punish counsel for contempt in violating the rule laid down by the statute, still, if reference has in fact been made in the hearing of the jury, the mischief has been

done, and can not be undone by the court in the progress of that trial." *Austin v. People* (1882), 102 Ill. 261, 264. See also *People v. Chellew* (1968), 104 Ill. App. 2d 100, 243 N.E.2d 49.

■■ The prosecutor inappropriately commented on defendant's right to remain silent. The injurious effect of the statement was exacerbated by the trial court's failure to immediately instruct the jury to disregard it. Hence, we conclude that error was committed.

Defendant next contends that he was denied a fair trial when the prosecutor introduced evidence and created inferences that he was a narcotics user. During the cross-examination of Monica Booth, the prosecutor asked her, "Would you take narcotics with this man, the defendant?" She replied, "No." Defense counsel objected and moved for a mistrial, stating that the question was improper because it was evidence of possession of narcotics, a crime under Illinois law of which defendant was not charged. The objection was overruled. The prosecutor resumed the questioning as follows:

> "PROSECUTOR: My question is this, Monica: Did you ever take narcotics with the defendant?
> MONICA BOOTH: No.
> PROSECUTOR: Did you ever observe the defendant taking narcotics?
> MONICA BOOTH: No.
> DEFENSE COUNSEL: Objection again, judge.
> THE COURT: No, that's all right. Overruled. Go ahead.
> PROSECUTOR: When you take narcotics would you become high?"

Later, during cross-examination, the prosecutor pursued a similar line of questioning in an alleged attempt to impeach the witness' testimony that she and defendant did not take narcotics together:

> "PROSECUTOR: Do you recall David Thomas ever writing to you and saying that I haven't been getting high because I don't have anyone to do it with? Only because I don't have anyone to do it with? Only because I want to see it that way?
> MONICA BOOTH: Yes." ·

The letter which contained defendant's statement was introduced into evidence and was allowed to be brought back to the jury room.

Finally, during closing arguments another reference was made by the prosecutor to defendant's drug use:

> "In fact, in the rest of the letter that you will get, 'I have not been getting high because I don't have anyone to do it with,' and her testimony, the whole situation, facts and everything, the robbery went down for dope. They needed money not for cigarettes but they needed money for dope."

■■ Generally, evidence of extraindictment offenses is inadmissible if relevant merely to establish defendant's propensity to commit crimes. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238.) The reason for this rule is that a defendant is entitled to have his guilt or innocence determined solely with reference to the crime for which he is charged, and this determination is not to be influenced by evidence which overpersuades the jury that defendant's past misdeeds make him worthy of punishment. Nevertheless, where such evidence is relevant to an issue in the case, tending to show motive, intent, identity, absence of mistake or modus operandi, it may be admissible. (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.) The admissibility of the other crime evidence depends on weighing on the one side, the actual need of that evidence and its convincingness and strength, and on the other side, the "degree to which the jury will probably be roused by the evidence to overmastering hostility." *People v. Butler* (1971), 133 Ill. App. 2d 299, 302, 273 N.E.2d 37, 39.

We must first decide whether the prosecutor's references to "getting high" actually allude to defendant's use of narcotics. "High" is defined by · Websters New Collegiate Dictionary 539 (1977), *inter alia*, as "excited or stupefied by a drug (as marijuana or heroin)." When this common understanding of the word is combined with the effect of several questions directed at Monica Booth concerning her observations of defendant's use of narcotics, the inference that defendant's "high" was produced by drugs is clear. Any doubt remaining as to the meaning of "high" vanished when the prosecutor asked Monica Booth, "When you took narcotics, would you become high?" Defendant's letter (that he wasn't getting "high" because he didn't have anyone to do it with) was introduced into evidence for the purpose of impeaching Monica Booth's testimony that she never took narcotics with defendant or observed him taking them. However, the excerpt from the letter is not in actuality impeaching because it does not state that Monica ever got "high" with defendant or that she ever observed him doing so. We do not address the question of whether the evidence of defendant's drug use was admissible under another theory because the State has offered none on review.

■■ The State, in its appellate brief, concedes the impropriety of the various references to defendant's use of narcotics, but argues that any error resulting from the incidents was cured by an instruction by the trial court and was harmless beyond a reasonable doubt. The jury was instructed that defendant's letter was to be used only in weighing the credibility of Monica Booth and not in determining defendant's guilt or innocence. However, since we have determined that the letter is not impeaching, the limiting instruction does not cure the error caused by the reference to narcotics, but only magnifies it. The State's "harmless error"

argument is equally without merit. The State asserts that any reference to defendant's narcotics use affects only his credibility, which was not in issue since he elected not to testify, and he was therefore not prejudiced. The admissibility of evidence of another crime, however, does not depend on whether defendant testifies on his own behalf, but whether its prejudicial effects outweigh its probative value. In the present case, the evidence was inflammatory and focused upon defendant's past misconduct rather than the crime for which he was charged. The references by the prosecutor and introduction of the letter were thus, erroneous. Any damaging effects of the prosecutor's reference during closing arguments to the robbery as being motivated "for dope" was reduced by a jury instruction stating that closing arguments were not to be considered as evidence. The comment, nonetheless, illustrates the prosecutor's attempt to establish a pervading theme of defendant's drug use rather than culpability for the crimes for which he was charged.

Finally, defendant contends that the State failed to prove that he was guilty beyond a reasonable doubt.

Virgil Winston testified that he recognized his granddaughter during the robbery on May 10, 1977, because of the shoes she wore and due to her voice. Although he could not describe the male offender with any detail immediately after the occurrence, he described him to police officers two days later as being a young black male between 19 and 23 years old, 5'8" tall, darkly complected with long black hair. Winston also identified defendant at trial. These descriptions were made possible, according to Winston, because he looked up into defendant's face while kneeling on the floor during the incident.

Defendant and Monica Booth were arrested on May 13, 1977, in a room at the Dorchester Hotel, where the police also found the proceeds of the robbery. The next day, Winston identified defendant at a police lineup as the male assailant. Prior to the lineup, Winston had seen Monica and defendant brought into the police station together, whereupon Gwendolyn Booth told him that defendant was the one who "runs around" with his granddaughter.

Monica Booth testified that she committed the robbery with John Stewart as her accomplice, not defendant. She explained that she placed the proceeds in the hotel room where she and defendant were arrested without the latter's knowledge.

The testimony of a single witness is sufficient to establish guilt beyond a reasonable doubt provided such witness has ample opportunity to observe and is credible. (*People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.) While the victim's testimony in this case suffered various inconsistencies, his identification of defendant was positive and was made after an ample period of observation. The jury, by its verdicts, chose to

believe the victim's testimony and to reject the testimony of Monica Booth, the sole defense witness who admitted robbing her grandfather. We conclude that there was sufficient evidence in the record to support defendant's convictions.

There were three major areas of error, however, that deprived defendant of his right to a fair trial in this cause. Although any one of these errors, standing alone, may not require a new trial, we cannot say that their cumulative impact was harmless beyond a reasonable doubt or did not contribute to his conviction. *People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880.

Accordingly, this case is reversed and remanded to the trial court for a new trial.

Reversed and remanded.

SULLIVAN, P. J., and MEJDA, J., concur.