(No. 57781.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JOHNNY NEAL, JR., Appellant.

*Opinion filed December 20, 1985.—Rehearing denied February 4, 1986.*

184

SIMON, J., dissenting.

Charles M. Schiedel, Deputy Defender, and Gary S. Rapaport, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Mark L. Rotert, James E. Fitzgerald and Ellen M. Flaum, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE WARD delivered the opinion of the court:

The defendant, Johnny Neal, Jr., was charged in a criminal information in the circuit court of Lake County, with three counts of murder (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1) through (a)(3)), one count of armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 18—2(a)) and one count of home invasion (Ill. Rev. Stat. 1981, ch. 38, par. 12—11).

The home invasion count was nol-prossed by the State prior to trial. Following a jury trial, the defendant was found guilty on all counts. A separate sentencing hearing was held before the same jury. The jury first determined that the defendant was eligible for the death penalty under sections 9—1(b)(6)(a) through (c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(b)(6)(a) through (b)(6)(c)). In the second phase of sentencing, at which the jury heard evidence in aggravation and mitigation, it unanimously decided that there were no mitigating factors to preclude the imposition of the death penalty. The court sentenced the defendant to death on the murder counts and, later, imposed an extended-term sentence of 60 years' imprisonment for armed robbery. The defendant has appealed directly to this court under section 4(b) of article VI of the Constitution of Illinois and under our Rule 603 (87 Ill. 2d R. 603).

The evidence showed that on August 22, 1982, the body of Lillian Waid, a 63-year-old widow, was found by her son on the bedroom floor of her residence in Waukegan. The house had been ransacked. An autopsy revealed 17 blunt trauma lacerations of the victim's head which caused multiple fractures of the skull. Two stab wounds to the left chest which penetrated the heart and a lung were inflicted after the victim's death. It was determined that Mrs. Waid had been dead two or three days before her body was discovered and that the cause of death was multiple blunt trauma to the head.

The victim's son, Ed Grissom, called the sheriff's office upon discovering his mother's body. Grissom testified that when investigators arrived, he gave the officers a piece of paper that he found in a bowl where his mother kept notes. The piece of paper had the names Johnny and Chris written on it, and a telephone number and address which was later determined to be the defendant's. Mrs. Waid's auto, a blue 1982 Oldsmobile,

188

was missing from her garage.

One of Mrs. Waid's neighbors, J.B. Buzbee, saw a brown or yellow Cadillac pull into Mrs. Waid's driveway at approximately 6:30 p.m. on August 19, 1982. Mr. Buzbee testified that he saw a man and woman get out of the car, meet Mrs. Waid on the patio and enter her house. The man and woman left the house after a short time. This was the last time that Buzbee saw Mrs. Waid. At trial, Mr. Buzbee also identified a picture of the defendant's car, a tan and yellow Cadillac, as the car that he saw parked in Mrs. Waid's driveway on the evening of the 19th.

Deputy Sheriff John Krempotic testified that on the afternoon on August 22, 1982, he was instructed to check the address noted on the paper found in the victim's home, for a brown or yellow Cadillac. He proceeded to the location of the address and found the defendant's car in the apartment complex parking lot where the defendant resided. Deputy Sheriff Steve Semenck testified that on August 22, 1982, he located the victim's auto in the parking lot of the Saloon tavern in Winthrop Harbor, the significance of which appears later.

Detectives Michael Blazincic and Charles Fagan testified that they were the investigating officers assigned to Mrs. Waid's homicide. After investigating the scene and questioning witnesses on August 22, 1982, they attended the autopsy of the victim later that day. After leaving the coroner's office, they received information that the car seen in the victim's driveway on the 19th was located at the address appearing on the piece of paper found at the crime scene. They went to the defendant's apartment at 11:30 p.m. on the 22nd of August, 1982, to interview him. A police dispatcher telephoned the defendant and requested that he meet the two detectives at the apartment-complex door. When the detectives

identified themselves and asked if they could speak to the defendant, he invited them into the apartment. The defendant's wife, Jutta, was also in the apartment.

Detective Fagan testified that he advised the defendant that they had information that his car, or one similar to his, had been parked in Mrs. Waid's driveway on the evening of Thursday, August 19. The defendant replied yes, that his car had been in her driveway. Fagan then advised the defendant that they were investigating the murder of Mrs. Waid. Fagan testified that the defendant appeared nervous and replied, "Well, I didn't do it."

At this point, Fagan asked the defendant if he would mind getting dressed and accompanying the detectives to their car for a private conversation outside the presence of his wife. Fagan testified that the defendant was very cooperative and willingly went with them to the car. Once in the car, Fagan gave the defendant *Miranda* warnings. The defendant acknowledged that he understood his rights and signed a written notification of rights form. Fagan asked the defendant of his whereabouts on the evening of the 19th. Fagan testified that the defendant stated that he and his wife went to Mrs. Waid's residence on the 19th about 8 p.m. to obtain motor oil for his car. After that they drove toward a bar named Clark's but had engine trouble on the way. They continued to the bar and the defendant told his wife to go inside. He repaired the car, then went inside, had a couple of drinks, and drove home with his wife. Fagan informed the defendant that Mrs. Waid's auto had been taken but was found at a tavern in Winthrop Harbor. The defendant replied that they would find his fingerprints in the car because he had driven Mrs. Waid to a doctor's office the day before.

Fagan asked the defendant if he had been drinking at a tavern called the Saloon in the late evening of the 19th. The defendant said that when he returned home on

the 19th, his wife went to sleep, and he did, in fact, drive to the Saloon to drink more beer. Fagan then told the defendant that the police had recovered Mrs. Waid's auto at the Saloon tavern, to which the defendant replied he was probably going to get the electric chair and told the detectives that he had killed Mrs. Waid. Fagan then asked the defendant if he would go with them to the sheriff's department for further questioning, to which the defendant said he would. Fagan again read the defendant his *Miranda* rights when they arrived at the station. The defendant then made a detailed confession to the murder of Mrs. Waid which was tape recorded. This tape was played for the jury at trial.

In his confession the defendant stated that he and his wife knew Mrs. Waid and that they went to her home on the 19th to borrow motor oil for his car. When Mrs. Waid was not looking the defendant took a set of keys from her kitchen with the intention of later using the keys to enter her residence and rob her. He and his wife then left, and while driving to a nearby bar the car developed engine trouble. He drove to the bar and told his wife to go inside while he fixed the car. Instead, he ran back to the Waid residence, carrying with him a knife and a 17-inch lead pipe filled with concrete and wrapped with black tape. As he approached her front door, Mrs. Waid saw the defendant through the screening and asked him what was wrong. He told her his car had engine trouble and "asked for a ride." She allowed the defendant to enter the house and the defendant then pulled out the knife and pipe and told her that he intended to rob her. He pushed her toward the bedroom and demanded her money. She pleaded with him not to hurt her. Once in the bedroom, she opened a black file cabinet and reached inside, apparently for money. The defendant stated he thought she was reaching for a gun so he struck her in the head with the pipe and she fell to

the floor. He then struck her several times more in the head, changing the pipe to his right hand during the course of the beating. He then apparently stabbed her twice with the knife. He stated that he "blacked out" after striking her a few times because he had a bad headache. There was no money in the file cabinet and no gun. The defendant ransacked the home. He took the victim's purse, which contained $25, went to the garage, and took off his bloody shirt. Wearing a T-shirt, he drove Mrs. Waid's auto back to the bar where he had left his wife. On the way, he threw from the car window a pair of gloves he used during the murder and robbery. These gloves were later recovered by the police. He entered the bar and had a few drinks with his wife, and they both returned to their apartment. When his wife fell asleep, he drove back to where he had left Mrs. Waid's auto. He retrieved his bloody shirt, Mrs. Waid's purse, and the knife and pipe from the back of Mrs. Waid's car and put them in a plastic garbage bag. He put the bag in his car and then drove Mrs. Waid's auto to the Saloon tavern and left it unlocked with the keys in it, with the hope that it would be stolen. He hitchhiked back to his car and drove it to Lake Michigan. He threw the garbage bag into the lake, but the bag floated. He waded to the bag and tore holes in it so it would sink. He stated that the purse did not sink but floated away. He then returned home.

The morning after his confession, the defendant led the police to the place where he had thrown the bag into the lake. The police recovered the lead pipe wrapped with black tape and also a long-sleeved green shirt which was determined to be the defendant's.

After the trial, the jury found the defendant guilty of murder and armed robbery. At the sentencing hearing the same jury found the existence of statutory aggravating factors and unanimously determined that there were

no mitigating factors to preclude the death sentence. (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(b), (c), (g).) The court sentenced the defendant to death.

The defendant first contends that the trial court erred in denying his pretrial motion to suppress his statements made to the police because those statements, and the physical evidence recovered as a consequence of those statements, were the result of an illegal arrest. (The defendant did not challenge the legality of the arrest at the hearing on the motion to suppress.) He argues that at the time he accompanied the detectives in their car, the time at which the trial court determined he was in custody, the officers did not have probable cause to arrest him. The State contends that the defendant was not under arrest prior to giving his confession since he voluntarily accompanied the detectives for questioning. Alternatively, the State argues that even if the defendant was under arrest when he consented to accompany the detectives, there was probable cause at that point to detain him.

At the hearing on the motion to suppress, the testimony of detectives Blazincic and Fagan was that, based on their investigation of the death of Mrs. Waid, they went to the defendant's home to interview him. The defendant invited the detectives into his apartment. They informed the defendant that they were conducting an investigation of the homicide of Mrs. Waid, at which point he became nervous and defensive. Further testimony was that the defendant voluntarily went with the detectives to their car and out of his wife's presence for additional questioning. It was in the car, after he was given *Miranda* warnings, that the defendant first told the detectives that he was the one who "did it." Later, at the sheriff's department, the defendant gave a detailed taped confession.

The defendant testified that he voluntarily let the de-

tectives in his apartment and went with them to their car. He stated that he thought he was under arrest when he was in the car. He testified that after he was read his rights he was questioned by both detectives, but denied giving any incriminating statements at that time. He said that he confessed to the murder at the sheriff's department only after being told by the detectives that he would get psychiatric help, and that he would not spend time in jail.

At the conclusion of the testimony the trial court found that the defendant was in custody at the time he was in the squad car with the detectives. The court further determined that the defendant understood his rights, there was no evidence of physical abuse, and that the defendant had voluntarily answered questions without threats, coercion or promises of psychiatric help. The court denied the motions to suppress the statements and physical evidence. As stated, the defendant did not raise any question as to the legality of the arrest.

To determine whether there is probable cause to arrest, police officers need not possess evidence sufficient to convict, but need only knowledge of facts which would lead a reasonable man to believe that a crime has been committed and that it has been committed by the defendant. (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 60.) It is clear that, applying this standard, the officers had probable cause to arrest the defendant in their car at the time he stated that he had killed Mrs. Waid. This is consistent with the trial court's ruling that the defendant was in custody in the car, after testimony at the hearing established that the defendant confessed to the killing after questioning in the car. Too, it is clear from the record, as evidenced by the defendant's own testimony, that the defendant voluntarily accompanied the officers to their car. The defendant was not handcuffed nor was he searched. The defendant was read his rights

before questioning and understood those rights as evidenced by the testimony of the officers and the waiver-of-rights form signed by the defendant. The trial court found that the defendant did not ask for an attorney, but voluntarily answered questions and confessed to the murder of Mrs. Waid. There was no illegal arrest, and the trial court was correct in denying the defendant's motion to suppress his statements and the physical evidence.

The defendant next contends that he was not proved guilty of armed robbery beyond reasonable doubt because there was no evidence, independent of the defendant's confession, to establish the *corpus delicti* of armed robbery.

In order for a conviction founded on a confession to be upheld, the confession must be corroborated by some evidence, exclusive of the confession, tending to show that a crime did occur and that the defendant committed it. (*People v. Willingham* (1982), 89 Ill. 2d 352, 358-59.) In *People v. Perfecto* (1962), 26 Ill. 2d 228, this court set out the criteria necessary to establish that a crime was committed, *i.e.,* the *corpus delicti* of a crime. It was stated:

> " 'if there is evidence of corroborating circumstances which tend to prove the *corpus delicti* and correspond with the circumstances related in the confession, both the circumstances and the confession may be considered in determining whether the *corpus delicti* is sufficiently proved in a given case. [Citation.] The same evidence may be used to prove both the existence of the crime and the guilt of the defendant, the test being whether the whole evidence proves the facts that a crime was committed and that the accused committed it. [Citations.]' " 26 Ill. 2d 228, 229.

The evidence here showed that on August 19 at 11:30 p.m., the back door of the victim's home was ajar and

the bedroom had been ransacked. The victim had been beaten to death and stabbed with a knife. The victim's car was found at the Saloon tavern, unlocked, with the keys in the ignition. Gloves splattered with human blood were found at the location the defendant stated he threw them out of the car window. The pipe and the defendant's shirt were discovered at the location in the lake where the defendant stated he threw them.

This evidence is consistent with the detailed confession of the defendant that he beat Mrs. Waid with the pipe, ransacked her bedroom, and took her purse which contained $25. That the purse was not found does not disprove that there was a robbery. Instead, the absence of the purse corroborates the defendant's statement that the purse floated away after he threw it in the lake. The record does establish the *corpus delicti* independent of the confession, in corroboration of the defendant's statements that he killed Mrs. Waid and took her purse and money. It was proper for the jury to find the defendant eligible for the death penalty, since there was the aggravating factor of murder in the course of the armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6)).

The defendant complains that improper comments were made by the prosecutor during closing arguments at trial and sentencing which require reversal of his conviction and vacation of the death sentence.

At the second phase of the sentencing hearing, at which evidence in aggravation and mitigation is introduced, the prosecutor argued:

> "There are no significant mitigating factors in this case to prevent you from imposing the death penalty. You are to follow the law, and you are to remember that from the time this case has started, and the evidence was presented, you have not seen or heard or observed in court, one moment of remorse by the defendant.
>
> [Defense Counsel]: Objection, your Honor.

[The Court]: Sustained."

The defendant argues that this statement improperly directed the jury's attention to the defendant's failure to testify. (The defendant testified at the hearing on the motion to suppress; he did not testify at trial or at the sentencing proceeding.)

A review of the entire record reveals that this comment was in reference to the defendant's taped confession which the jury heard at trial. The prosecutor had argued at trial and sentencing that the defendant gave a cool and unemotional account of the murder, demonstrating a lack of remorse for his crimes. The defendant's remorse is a proper subject for consideration at sentencing (*People v. Albanese* (1984), 102 Ill. 2d 54, 80-81), although the prosecution, of course, cannot comment on the defendant's failure to take the stand in his own defense (*People v. Lyles* (1985), 106 Ill. 2d 373, 390). Any inference from the prosecutor's comment was cured by the court's sustaining defense counsel's objection and its instructions to the jury to disregard comments to which objections were sustained. We consider that this brief, and, at worst, ambiguous comment did not result in the defendant's being denied a fair sentencing hearing.

The defendant points to other comments made by the prosecution which he argues were improper. As the State notes, however, there were no objections at trial to the comments, and the defendant did not mention them in his post-trial motion. The questions have been waived. (*People v. Lyles* (1985), 106 Ill. 2d 373, 392; *People v. Collins* (1985), 106 Ill. 2d 237, 275, 284; *People v. Gacy* (1984), 103 Ill. 2d 1, 88.) The defendant argues that we should consider the issues under the plain-error doctrine (see 87 Ill. 2d R. 615(a)), which may be invoked where the evidence is closely balanced or the error so egregious that a denial of a fair trial or sentencing hearing re-

sulted (*People v. Stewart* (1984), 104 Ill. 2d 463, 488). Here, the prosecution's evidence was overwhelming and the alleged errors cited by the defendant did not deny him a fair trial or sentencing hearing.

We would note that one of these complained-of comments was that during the prosecutor's closing argument at trial, he made a passing reference to the victim's children and grandchildren to the effect that they were left without a grandmother. Argument that the deceased left a family is improper, as it has no bearing on the guilt or innocence of the accused. (*People v. Holman* (1984), 103 Ill. 2d 133, 166; *People v. Bernette* (1964), 30 Ill. 2d 359, 371.) The prosecutor's fleeting remark here, considering the evidence, did not constitute reversible error.

The defendant claims that there were errors during the *voir dire* examination which denied him a fair trial. The issues he raises, however, have been decided adversely to his contentions in recent decisions of this court. This court has determined that qualification of jurors under *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, where potential jurors are excused for cause if they would automatically vote against the imposition of the death penalty regardless of the evidence, does not deny the defendant his right to a jury drawn from a fair cross-section of the community. (*People v. Stewart* (1984), 105 Ill. 2d 22, 67; *People v. Silagy* (1984), 101 Ill. 2d 147, 165.) Too, we have rejected the defendant's complaint that qualification of prospective jurors under *Witherspoon* will result in a conviction-prone jury. *People v. Collins* (1985), 106 Ill. 2d 237, 278-79; *People v. Gacy* (1984), 103 Ill. 2d 1, 37-38.

In a related argument, the defendant contends that the trial court erred in denying his motion to conduct the *voir dire* of each juror individually and outside the presence of the other prospective jurors. Under our Rules 431 and 234 (87 Ill. 2d Rules 431, 234) the trial

judge may, at his or her discretion, conduct individual *voir dire* out of the presence of other jurors but is not required to do so. (*People v. Newbury* (1972), 53 Ill. 2d 228, 241.) Here, the trial judge explained that, because of the lack of security and facilities, he could not conduct individual *voir dire* examinations. The judge explained to counsel, however, that he would receive individual, not collective, answers to death penalty questions, he instructed counsel to avoid prejudicial wording of questions, and he said that, should a question be put which might provoke a prejudicial answer, he would interrupt and take corrective action. These precautions taken to prevent prejudice in jurors' minds override the speculative suggestion by the defendant that the venire was tainted by the court's failure to individually question the jurors. The trial court did not abuse discretion in denying the defendant's motion.

The defendant argues, too, that his death sentence should be vacated because he was denied effective assistance of counsel at sentencing due to his attorney's failure to present sufficient mitigating evidence, which the defendant claims was contained in a presentence investigative report. The report was prepared for the court for sentencing on the armed-robbery conviction, after the defendant had been sentenced on the murder conviction.

In *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, the Supreme Court held:

> "When a defendant challenges a death sentence * * * the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." (466 U.S. 668, 695, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052; 2069.)

*Strickland* reasonably recognized that a reviewing court

"need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (466 U.S. 668, 697, 80 L. Ed. 2d 674, 699, 104 S. Ct. 2052, 2069-70.)

The record here discloses no prejudice to the defendant. The information in the presentence report was introduced at the sentencing hearing, including the defendant's present and previous marriage relationships, his employment history, and criminal record. As noted, the defendant declined to testify at the sentencing hearing contrary to the advice of his attorney. The complaint against the attorney is unfounded. Even if, *arguendo*, there was some factual basis for the complaint, the defendant has failed to show a reasonable probability that, absent the assumed error, the jury would have concluded that the death penalty was not warranted.

The defendant contends, too, that he confessed in reliance on police assurances that he would not be executed and therefore his death sentence was imposed in violation of due process.

At the hearing on the motion to suppress, the defendant testified that the investigating officers told him that he would not have to worry about receiving the death penalty if he confessed. Detective Fagan, however, testified that in the squad car when he told the defendant that they found the victim's car at the Saloon tavern, the defendant stated that he thought he was going to get the electric chair. Further questioning continued:

"[Asst. State's Atty.]: Was that the first mention of any electric chair?

[Detective Fagan]: Yes. He made mention of it, not me.

Q: Did you then tell him he was watching too much TV and he wouldn't get the electric chair?

A: Yes, something—I—

Q: You told him he would not get the electric chair?

A: No, I didn't say anything to him when he said that statement. I just said, 'were you involved in this or would you give us any information if you know of any?' And he stated that he did it."

On cross-examination Detective Fagan again denied telling the defendant that he would not get the death penalty. At the conclusion of this testimony, the trial court found that the defendant's statement was voluntarily made.

The rulings of the trial court as to the voluntariness of a confession will not be disturbed unless contrary to the manifest weight of the evidence. (*People v. Davis* (1983), 95 Ill. 2d 1, 25.) Here, a question of credibility was involved, and the trial judge, who was able to observe the witnesses, obviously believed the detective's version of the events and not the defendant's.

The defendant's next contention is that his death sentence is an excessive penalty in light of his character and background. He cites other cases where individuals were convicted of similar crimes but did not receive the death penalty, as evidence of the irrational and disproportionate nature of his death sentence.

In *Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871, the Supreme Court held that the Constitution does not require "a state appellate court, before it affirms a death sentence, to compare the sentence in the case before it with penalties imposed in similar cases." (465 U.S. 37, 44, 79 L. Ed. 2d 29, 36, 104 S. Ct. 871, 876.) The Constitution does require, however, a "consideration of the character and record of the individual offender and the circumstances of the particular offense" before a determination is made that the death sentence is proper in a given case. (*Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991; *People v. Free* (1983), 94 Ill.

2d 378, 428; see Ill. Const. 1970, art. I, sec. 11.) This court has held that a sentence does not offend the proportionality requirement if it is commensurate with the seriousness of the crime and gives adequate consideration to any relevant mitigating circumstances, including the rehabilitation potential of the defendant. *People v. Perez* (1985), 108 Ill. 2d 70, 93; *People v. Szabo* (1983), 94 Ill. 2d 327, 352.

During the second stage of the sentencing hearing, the jury had before it evidence of the defendant's family background and employment history. It had evidence of his prior criminal history, a felony conviction in Nevada for "swindling" for which he was serving a term of probation when he committed the crime here. Too, the jury heard the defendant's confession telling of the brutal murder of Mrs. Waid, including the plan the defendant followed to gain the confidence of a defenseless woman to enter her home with the intent to rob her, and then beat her to death as she begged not to be harmed. In light of the evidence introduced in aggravation and mitigation and the testimony at trial, we cannot say that the death sentence imposed on the defendant is excessive.

The defendant argues that the trial court erred in instructing the jury at the second phase of the sentencing hearing that "Neither sympathy nor prejudice should influence you." The defendant contends that the jury should have been allowed to consider sympathy as a mitigating factor against the imposition of the death penalty.

We would first note that the defendant did not request such an instruction and, by tendering it, preserve the request for the record. Second, the defendant did not express any objection to this instruction and is precluded from now assigning it as error. (*People v. Perez* (1985), 108 Ill. 2d 70, 91-92; *People v. Lewis* (1981), 88 Ill. 2d 129, 149.) Beyond that, this court, in *People v. Stewart*

(1984), 104 Ill. 2d 463, 493-94, held that the giving of this instruction is not improper.

The defendant contends, also, that the death penalty was imposed in violation of the eighth and fourteenth amendments of the Constitution of the United States, where the sentencing jury was not required to find that death was an appropriate punishment, in addition to finding that mitigating factors did not outweigh aggravating factors. He argues, too, that the sentencing jury may have erroneously assumed that it was the defendant's burden to prove that the death penalty was inappropriate. In *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 446, and *People v. Stewart* (1984), 105 Ill. 2d 22, 76-77, however, this court decided adversely to the contentions the defendant makes.

The defendant argues that the death penalty statute violates the eighth and fourteenth amendments to the Constitution of the United States. This is because, he says, when the statute is considered together with sections 104—22 and 104—26(b) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, pars. 104—22, 104—26(b)), the imposition of the death penalty is arbitrarily limited to individuals who speak English and who do not require translators or other assistance to understand the proceedings or assist in their defense. The argument represents a complete misapprehension as to the statute's meaning that this court has addressed and rejected in a number of decisions (*People v. Madej* (1985), 106 Ill. 2d 201, 212; *People v. Albanese* (1984), 104 Ill. 2d 504, 539-40; *People v. Stewart* (1984), 104 Ill. 2d 463, 499-502).

The defendant next contends that the death penalty statute is unconstitutional because it does not provide a means to assure that all aggravating factors relied upon by the sentencing body were relevant or constitutionally permissible. In *People v. Perez* (1985), 108 Ill. 2d 70, 97-

98, we rejected the contention made by the defendant and noted that this was but a version of the argument rejected many times, that consideration of nonstatutory aggravating factors by the sentencer results in an arbitrary and capricious imposition of the death penalty (*People v. Collins* (1985), 106 Ill. 2d 237, 285; *People v. Madej* (1985), 106 Ill. 2d 201, 211; *People v. Stewart* (1984), 105 Ill. 2d 22, 75).

Two other arguments made by the defendant have been rejected by this court, and the defendant offers no persuading reasons for us to reconsider those holdings. This court has rejected the contention that the death penalty statute is unconstitutional because it fails to provide a sentencing scheme to insure an adequate comparative review of capital cases. (*People v. Del Vecchio* (1985), 105 Ill. 2d 414, 444; *People v. Owens* (1984), 102 Ill. 2d 145, 160; see also *Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871.) It has also been determined that the death penalty statute is not unconstitutional because prosecutors are given discretion in deciding whether to seek the death penalty. *People v. Brisbon* (1985), 106 Ill. 2d 342, 362; *People v. Gacy* (1984), 103 Ill. 2d 1, 105; *People v. Caballero* (1984), 102 Ill. 2d 23, 49.

Finally, the defendant contends that the trial court erred in imposing an extended-term sentence for the armed-robbery conviction. As the People point out, the defendant made no objection at the time of sentencing and the question was not raised in a motion for a new trial. The question was not raised in the brief the defendant originally filed in this appeal; it was raised only in the supplemental brief the defendant filed. The point has been waived for appeal.

In any event the claim does not have merit.

The extended-term statute provides:

"A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 for the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present. Where the judge finds that such factors were present, he may sentence an offender to the following:

(1) for murder, a term shall be not less than 40 years and not more than 80 years;

(2) for a Class X felony, a term shall be not less than 30 years and not more than 60 years; ***." (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—2(a).)

The defendant's argument is that the statute did not allow an extended-term sentence for armed robbery here, since that offense is not in the class of the most serious offense of which he was convicted, that is, murder.

The defendant's contention would be valid if he had been given an extended-term sentence of imprisonment on the murder conviction. (See *People v. Jordan* (1984), 103 Ill. 2d 192, 203-06.) The sentence here, however, was not for a term of years. A death sentence was imposed, and the extended-term statutory provision was not applicable. The statute authorizing extended terms refers to and is bottomed on, in a sense, the maximum sentences "authorized by Section 5—8—1," to which it refers. That section refers to terms of imprisonment and does not include capital sentences. Obviously a provision for an extended term of imprisonment would not be applicable to a sentence of death. The precise contention made here was not presented in *People v. Collins* (1985), 106 Ill. 2d 237, 285, but an extended term of 60 years for armed robbery was held to be proper, though the defendant had also been sentenced to death. We hold that the statute allows the imposition of an extended-term sentence of imprisonment for the class of the most serious offense of which the defendant was convicted when defendant was

sentenced to a term of years, and this is so even though the defendant also was separately sentenced to death for murder.

For the reasons given, the judgment of the circuit court of Lake County is affirmed. The clerk is directed to enter an order setting Wednesday the 26th day of March, 1986, as the date on which the sentence of death, entered by the circuit court of Lake County, shall be executed. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of the mandate in this case shall be furnished by the clerk of this court to the Director of the Department of Corrections, to the warden at Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*Judgment affirmed.*

JUSTICE SIMON, dissenting:

As fully explained in my dissent in *People v. Wright* (1985), 111 Ill. 2d 128, conviction by a jury which has been death-qualified, in my opinion, violates a defendant's sixth amendment right to be tried by a jury drawn from a fair cross-section of the community. (*Grigsby v. Mabry* (8th Cir. 1985) (*en banc*), 758 F.2d 226.) For this reason I disagree with the manner in which the majority applies *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (111 Ill. 2d at 197). Since a prospective juror was excluded for cause from the jury in this case after stating that he could not vote for the death penalty, I believe that the convictions should be reversed and the cause remanded for a new trial.

Further, the prosecutor's argument here which focused on the victim's family and the probable reaction of the victim's son to finding his mother's body was an

"improper appeal to the emotions of the jurors" (*People v. Holman* (1984), 103 Ill. 2d 133, 166) warranting reversal.

In the course of his closing argument, the prosecutor said that the police "were confronted at first with talking to the son, Ed Grissom, of Mrs. Waid. Now, if you can feel in your mind and in your heart, the horror that Ed Grissom must have faced when he walked into the bedroom, first, his mother's bedroom, and saw it ransacked, and thinking it was only a burglary, and then went back there and saw his mother, beaten to death, bloody on the floor, I mean, there is nothing to explain that type of horror. It could only be felt by the person that it happens to." Shortly thereafter, the prosecutor argued that defendant "brutally murdered her, and ended a full life, when she was in the midst of her golden years, leaving children and grandchildren, without a grandmother and victimizing that class of citizens, that we victimize too much."

References to a victim's family are improper and prejudicial. (*People v. Holman* (1984), 103 Ill. 2d 133; *People v. Ramirez* (1983), 98 Ill. 2d 439; *People v. Hicks* (1963), 28 Ill. 2d 457; *People v. Gregory* (1961), 22 Ill. 2d 601; *People v. Dukes* (1957), 12 Ill. 2d 334.) In my opinion, the prosecutor's second comment, standing alone, would require reversal. The fact that the victim left children and grandchildren is every bit as irrelevant here as were similar remarks in both *Holman* and *Hicks*. But even were this comment not sufficient to justify reversal, the total effect of the two quoted statements went well beyond a mere reference to the fact that there were surviving family members. The prosecutor explicitly invited the jurors to place themselves in the position of the victim's son and try to imagine his horror. Although the son's testimony as to finding his mother's body was itself relevant to establishing defendant's guilt, his reac-

tions to finding the body were irrelevant to any issue in the case. The prosecutor's argument dwelling upon the son's horror constituted a blatant visceral appeal which served no other purpose than to inflame the jury against defendant. Unlike the majority, on this record I cannot conclude that the reference to the victim's family was "fleeting" (111 Ill. 2d at 197). I would therefore reverse defendant's convictions.

In addition to the two improper references during closing argument at the guilt phase, the prosecutor renewed his emotional appeals during his rebuttal closing argument at the sentencing hearing. In the course of explaining why the death sentence should be imposed, the prosecutor said:

> "Well, I do have, because of the nature of my position, the ability to judge people, and deal with people on a daily basis, and I see several thousand incidents and victims in this situation, *and I can look into Ed Grissom's eyes,* or I can look into other senior citizens eyes in this county, and tell you what they are thinking about this case, *and I can tell you how they feel, I can tell you how Ed Grissom, and his children feel, that his mother was murdered, and I can tell you how he felt when he discovered her, on August 22nd, 1982. It doesn't take great talent to tell you how they felt, because I think you know how he felt."* (Emphasis added.)

Immediately thereafter he requested the death penalty. This argument independently requires that we vacate the death sentence since the prosecutor sought to "relate [the] defendant's punishment to the existence of family" (*People v. Bernette* (1964), 30 Ill. 2d 359, 371) and their reaction to the crime. Moreover, the repetition of the prosecutor's improper argument in the sentencing hearing evidences his intention during the guilt stage to inject emotional appeals into the proceedings.

The death sentence should also be vacated on two other grounds. First, the sentence cannot stand here be-

cause yet another part of the prosecutor's argument during the sentencing hearing violated defendant's fifth amendment right against self-incrimination.

Direct reference by a prosecutor to a defendant's failure to testify is always a violation of the defendant's fifth amendment right against self-incrimination. (*Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229; *People v. Lyles* (1985), 106 Ill. 2d 373, 390.) Even an indirect reference to the defendant's silence is constitutionally impermissible if the comment was such that the jury would " '*** naturally and necessarily take it to be a comment on the defendant's failure to testify.' " (*United States ex rel. Burke v. Greer* (7th Cir. 1985), 756 F.2d 1295, 1300, quoting *United States v. Lyon* (7th Cir. 1968), 397 F.2d 505, 509.) The defendant's fifth amendment right and the proscription against commenting on the exercise of that right extend to the sentencing phase of trial. (*People v. Ramirez* (1983), 98 Ill. 2d 439, 449.) Consistent with these principles, the prosecutor's direct reference to the defendant's silence during the sentencing hearing in this case requires that the death sentence be vacated.

During the prosecutor's closing argument in the sentencing hearing he told the jury:

> "You are to follow the law and you are to remember that from the time this case has started, and the evidence was presented, you have not seen or heard or observed in court, one moment of remorse by the defendant."

The defense counsel immediately objected, and the judge sustained the objection but did not then admonish the jurors to disregard the remark or advise them not to consider defendant's failure to testify. The prosecutor's reference here is exactly the kind which the fifth amendment proscribes.

Unquestionably, the prosecutor's comment called attention to the defendant's behavior at some stage of the

proceedings. However, the majority concludes that the remark actually refers to the defendant's lack of remorse as exhibited in the taped confession which the jury heard at trial. This interpretation is not supported by an examination of the prosecutor's actual words.

The prosecutor did not say that "you did not hear any display of remorse in the taped confession." Rather, he told the jury that they had not "*seen* or heard or *observed*" any remorse by the defendant. If the prosecutor's comment was directed only to defendant's taped confession, then the reference to not *seeing* or *observing* remorse is meaningless; remorse cannot be "seen" or "observed," of course, on a tape recording. In addition, the prosecutor's own words define the context of defendant's failure to demonstrate remorse as "in court." The natural meaning of "in court" is not restricted to what the jury heard on the tape recording, but encompasses everything that occurred within the presence of the jury.

Further, the time frame which the prosecutor referred to makes clear that the jury would naturally take this comment as directed to defendant's refusal to testify. The prosecutor told the jury that the relevant time period was "from the time that this case has started." The majority simply ignores this language and arbitrarily restricts its scope to one portion of the trial.

In fact, by pointing out that nothing they had seen, heard, or observed in court since the case started demonstrated remorse, the prosecutor directly called the jury's attention to the defendant's course of conduct throughout the trial and, most obviously, his failure to take the stand in his own defense.

The prosecutor's comment here was similar in content and probable effect on the jury to the prosecutorial remark in *People v. Ramirez* (1983), 98 Ill. 2d 439, 451. There, this court vacated the defendant's sentence because the prosecutor argued during the sentencing hear-

ing that "[h]e [the defendant] has sat silent before you, before his accusers and before the tryer [*sic*] of fact and offered no explanation for the murder." (98 Ill. 2d 439, 451.) The State maintained in *Ramirez*, as it does here, that the comment was directed only to the defendant's lack of remorse. This court properly rejected that argument. The question is not simply what the prosecutor intended (*United States v. Rodriguez* (7th Cir. 1980), 627 F.2d 110), but whether, in fact, the comment "specifically refers" to the defendant's silence (*People v. Ramirez* (1983), 98 Ill. 2d 439, 451). I can discern no difference of constitutional magnitude between the remark that the jury had not "seen or heard" any display by the defendant and saying that the defendant was "silent." See also *United States v. Rodriguez* (7th Cir. 1980), 627 F.2d 110, 111 (comment that defendant "throughout the trial has been very quiet at the end of the counsel table" held reversible error).

Even if the comment at issue in this case is not construed as a direct reference to defendant's failure to take the stand, it is certainly an impermissible indirect one, since the jury would "naturally and necessarily" understand it to refer to defendant's failure to testify. (*United States ex rel. Burke v. Greer* (7th Cir. 1985), 756 F.2d 1295, 1300.) The fact that the statement could also be taken as a mere allusion to the taped confession is irrelevant. In *People v. Kelley* (1963), 29 Ill. 2d 53, the State argued that a remark by the prosecutor might have referred to defendant's failure to reply to an accusation by the victim at the crime scene that defendant shot him. This court said there that the prosecutor should "refrain from making any argument that *could be construed* by the jury as a comment on her failure to testify." (Emphasis added.) 29 Ill. 2d 53, 61.

The majority suggests that even if there was error in this case it was cured when the circuit judge sustained

the defense counsel's objection and eventually instructed the jury to disregard comments to which objections were sustained. In my view, the mere fact that the court sustained a general objection to the argument can have had no curative effect. The jurors are not lawyers and cannot be expected to understand either counsel's reason for objecting or the meaning of the judge's ruling. It is also plain to me that the general injunction by the court, after the close of argument, to disregard any statements to which objections had been sustained can be of absolutely no value; the majority's argument assumes a superhuman capacity for comprehension and retention as lacking in jurists as it is in jurors.

The majority's conclusion here simply ignores the established rule that the prejudicial effect of improper argument can be erased, if at all, by the "act of *promptly* sustaining the objection and instructing the jury to disregard such argument." (Emphasis added.) (*People v. Baptist* (1979), 76 Ill. 2d 19, 30.) Even a final instruction on the defendant's right to remain silent is not adequate to cure the error where the judge has not immediately admonished the jury to disregard the remarks. (*United States ex rel. Burke v. Greer* (7th Cir. 1985), 756 F.2d 1295, 1303.) A final instruction to disregard arguments to which objections were sustained is therefore wholly impotent.

The majority claims that this "brief and, at worst, ambiguous" comment did not deny the defendant a fair sentencing hearing. (111 Ill. 2d at 196.) I would point out that, in view of the extreme penalty imposed here, we should demand a very high degree of procedural and substantive regularity. Moreover, even in noncapital cases, this court has not required a showing of prejudice where a "plain error" of this type is involved. (See *People v. Wollenberg* (1967), 37 Ill. 2d 480, 488.) In my opinion, the prosecutor's argument here violated defendant's

fifth amendment right against self-incrimination.

Finally, for the reasons set forth in my separate opinions in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting), in *People v. Silagy* (1984), 101 Ill. 2d 147, 184 (Simon, J., concurring in part and dissenting in part), and in *People v. Albanese* (1984), 104 Ill. 2d 504, 549 (Simon, J., concurring in part and dissenting in part), I believe that the Illinois death penalty statute is unconstitutional and that therefore no sentence imposed under that statute can stand. For these reasons, I think the sentence of death imposed on defendant should be vacated.