THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOHN BRITZ, JR., Defendant-Appellant.

Fourth District   No. 4—88—0192

Opinion filed July 10, 1989.—Rehearing denied August 7, 1989.

Daniel D. Yuhas and Charles W. Hoffman, both of State Appellate Defender's Office, of Springfield, for appellant.

Donald M. Cadagin, State's Attorney, of Springfield (Kenneth R. Boyle, Robert J. Biderman, and Denise M. Ambrose, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

On January 26, 1988, defendant John Britz, Jr., was found guilty by a jury sitting in Sangamon County of committing the offense of murder, in violation of section 9—1 of the Criminal Code of 1961 (Criminal Code) (Ill. Rev. Stat. 1987, ch. 38, par. 9—1). He was subsequently sentenced to 25 years' incarceration. He now appeals, alleging (1) he was not proved guilty beyond a reasonable doubt; (2) the court improperly conducted jury *voir dire*; (3) impermissible eavesdropping evidence was admitted; and (4) the prosecutor made improper closing argument. We affirm.

Defendant was originally convicted for this offense in April 1983. This court reversed and remanded, finding error with the jury *voir dire*, and that a statement given on July 12, 1979, should have been suppressed. (*People v. Britz* (1984), 128 Ill. App. 3d 29, 470 N.E.2d 1059.) Our supreme court affirmed this reversal. (*People v. Britz* (1986), 112 Ill. 2d 314, 493 N.E.2d 575.) On the initial retrial in May 1987, the jury became hung, and a mistrial was declared. The trial resulting in the present conviction commenced on January 19, 1988.

The State's evidence established that on June 9, 1979, T.M. was found shot to death at a Clark gas station in Springfield. He was discovered lying on his back near the right front tire of his van. His billfold was found lying open near his body without any money in it. Next to the left front tire was a screwdriver, a removed hubcap, and an air hose.

T.M. had a single bullet wound to his upper right shoulder. There was little blood. Expert testimony established he was shot with a .22 caliber bullet which went through his shoulder, both lungs, and his heart. He may have died immediately. If not, he could have moved only a short distance. The muzzle of the weapon would have had to have been held between several inches and two feet of the shoulder. The path of the bullet is consistent with T.M. being in a kneeling or crouched position at the time he was shot.

Bernard Ebel lives in the second house south of the gas station. At 5:30 a.m. on the morning of June 9, 1979, he was sitting on his back porch when he heard one gunshot. A few minutes later, he observed a person cut across the backyard of his neighbor to the north, go to the alley behind his house, and follow the alley south to Fourth Street. He described the person as a white male approximately 17 to 21 years of age, of medium height, and with dark hair over his ears. He did not get a view of the person's face and could not identify him.

Harold Goff was interviewed by police on June 9, 1979. Since he died before trial, his statement was introduced. On June 9 at 5:05

a.m., he was at the Lucky Lady Laundromat where he worked. Next to the building in the parking lot, he saw a white male, 19 to 21 years of age, around 5 feet 8 inches tall. The youth was clean shaven with black hair brushed back on the sides. The youth had a long-barrelled, .22 caliber gun holstered to his side. When asked what he was doing, the youth just shook his head. Goff reentered the laundromat and, several minutes later, noticed the youth was gone. The laundromat was located in the same complex as a Kroger Store and was two to three blocks from the scene of the murder. Goff was later shown a photographic lineup, which did not include a picture of defendant, and picked someone else. In 1982, Goff was again asked to help but stated his eyesight was too bad to identify anyone positively.

On June 11, 1979, Cheryl Penman, a counselor with the Youth Services Bureau, took a call from defendant on the bureau's hot line. The bureau counsels juveniles with drug and alcohol problems. On that day, defendant called four or five times. Around 10 p.m., he called saying he had been doing PCP, also known as angel dust, and had been picked up the night before as a suspect in this murder. He told her he looked a lot like the composite picture and repeatedly asked, "Do you think I could have done it?"

Penman and Bart Quick, a psychologist with the bureau, met briefly with defendant the next day. During that day, defendant called the bureau in excess of 100 times. Once he was upset and told Penman he had killed before and would kill again if she related to anyone the conversation they had about the shooting. Around 6 p.m., he called back. Penman directed Quick to pick up the extension phone. Quick placed his hand over the mouthpiece and listened. They heard defendant say, "I was the one," in discussing the instant offense. Quick opined that, even though defendant was then 19, his actions were more age-appropriate for a 12-year-old.

Approximately two years later, Penman saw defendant in a bar where he was drinking. He told her that he had fooled Detectives Marcia Lange and William DeMarco and had committed the offense.

By June 22, 1979, defendant was a suspect in the crime because he matched the composite of the perpetrator, and he had made the comments to Penman. Marcia Lange, the detective in charge of the investigation, got Penman to reluctantly cooperate with an eavesdropping procedure. An order was entered, and 10 telephone conversations between Penman and defendant, which took place between July 3 and July 13, 1979, were taped.

The conversations revealed that defendant, insisting that Penman misunderstood his earlier comments, continually denied any involve-

ment in the shooting. He exhibited a keen knowledge of guns. He also expressed a fear about police taping his telephone conversations. Penman repeatedly told defendant she was concerned about him, and he should get his problems off his chest. She also appealed to his masculinity, at one point, telling him she found his police involvement exciting. Finally, on July 12, she urged defendant to meet her at the police station and to talk with the police. Late that night, he agreed to do so and, after speaking with the police for an hour, he left.

Around 3 a.m. on July 13, 1979, defendant contacted the police and wished to speak with Lange. She and chief-of-detectives DeMarco met defendant at the station. Defendant did not appear under the influence of drugs or alcohol. After waiving his *Miranda* rights, defendant stated that he could not remember what he was doing or where he was on the night of the murder. He then stated, "I think I could have been the person who killed him." He went on to say only he and God really knew what happened that night. After the interview, defendant left.

The next day, July 14, around 12:20 p.m., defendant, who was in custody on unrelated charges, again asked to meet with Lange and DeMarco. He stated he remembered being at the Clark gas station on the night of the murder and, also, being at the Kroger parking lot prior to that time. He remembered having a weapon in his possession, which may have been in its holster. He also remembered hearing a shot and running down the alley southward.

On July 15, defendant instigated another interview with Lange and DeMarco. Also present was Detective John Tolley. Defendant stated, "I know I did it." He did not know why, explaining he was messed up on PCP at the time of the shooting. He remembered having a .22 caliber revolver, seeing the victim kneeling by his right rear tire, hearing a shot, and seeing the victim fall face forward. He stated he was four to six feet away from T.M. when he shot him. He remembered taking T.M.'s wallet, removing money, and dropping it near the body. He then fled south down the alley and, eventually, threw the gun in the river. Defendant stated there was no doubt in his mind that he did it. In all interviews, defendant was supplying all the information.

Defendant was then taken to the scene, where he reenacted the shooting and showed the detectives the route he followed as he fled. He showed that he jumped a small fence into the backyard of the first house south of the station. He ran across the yard to the alley, and down the alley to Fourth Street.

Lange and DeMarco placed defendant's height to be around 5 feet

10 inches tall. DeMarco also stated that, despite efforts, the gun was never recovered from the river. Tolley explained the difference between an automatic weapon and a revolver is that an automatic discharges a spent cartridge while a revolver does not.

Defendant was arrested for the murder. However, charges were later nol-prossed due to insufficient evidence.

In 1982, Detective Alan Daley was involved in the murder investigation. In June 1982, he executed a search warrant on defendant's trailer and seized two .22 caliber bullets which had been shot into the wall. The bullets could have come from the same gun as the bullet which killed T.M. The bullets had similar class characteristics but, due to the damage from striking the wall, no individual characteristic similar to both could be identified. These class characteristics are common to a number of different types of .22 caliber weapons.

During the summer of 1982, defendant contacted Daley at least 20 times stating he was trying to get information on the murder to help solve it. On September 9, 1982, Daley interviewed defendant concerning the homicide. Defendant gave a written statement at that time. The substance of the statement is that on the night of the murder, he was in the home or shop of Dennis Burke and was talking with Penman on the hot line the entire night. Defendant also acknowledged shooting one of the bullets into the wall. Defendant was arrested for this murder on September 23, 1982.

On October 6, 1982, defendant again contacted Daley. At this interview, Detective Charles Pennell was also present. Defendant then spoke about and reenacted the present offense. He told Pennell to kneel or squat, and then walked up behind Pennell, indicating his finger was a .22 caliber revolver. He placed his finger at the back of Pennell's right shoulder. He indicated that the victim turned to speak, and then he shot the victim in the upper shoulder. At that point, he fled to his father's garage, going south through the alley. After the shooting, he picked up the wallet, taking the money, and dropped the wallet next to the body. When Pennell left to get refreshments, defendant started crying and said, "Al, I didn't mean to kill him; I didn't mean to kill him." Defendant was again supplying all the information. He also drew a rough picture of the crime scene.

Defendant also gave two other versions of the incident. In one, defendant was lying ill on the floor of the gas station bathroom. The victim opened the door, and defendant shot him. He then dragged the victim to his van. In the other, defendant had fallen asleep at the station. The victim came up and got into a fight with defendant, whereupon defendant shot him.

On October 8, defendant again asked Daley to come talk with him. Defendant said he felt he had done the actual shooting. He remembered hearing a shot, seeing the victim fall, and running south through the alley. At one point, he started crying and said, "I shot the guy."

In April 1985, defendant was a roommate of Kevin Jackson. At the time of the trial, Jackson was an inmate in the Illinois Department of Corrections. He has seven convictions for burglary, three for theft, and one for escape. He has known defendant in excess of 15 years. Jackson asked defendant how T.M. died. Defendant stated T.M. died quickly, and there was not much blood. Defendant explained that T.M. was putting air in his tire, and defendant walked up behind him, shooting him in the head. In July 1985, defendant told Jackson that he was not worried about his trial because he was going to have Penman killed.

In September 1986, defendant was a roommate of Craig Foster. At the time of trial, Foster was awaiting sentencing on Federal charges, which contained a maximum of 37 years in jail. Defendant told Foster that defendant did not know whom he could trust because he had earlier talked with a roommate who ended up testifying against him, and it was very damaging. He then stated shooting the victim was a rush. Since he was intoxicated, it did not sink in until later that he killed somebody. He then felt bad. The State rested.

Defendant presented evidence that the composite looked like another person, and this was the same person Goff picked out of the photographic lineup. However, police officials testified they were satisfied this person had an alibi. There was evidence that defendant was listed as six feet tall when he was in the service, and that he was in special education classes in school. Defendant also introduced three newspaper articles and one radio story about the shooting that ran in Springfield shortly after the incident. The jury found defendant guilty as charged.

■ Defendant initially contends he was not proved guilty beyond a reasonable doubt. A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Vriner* (1978), 74 Ill. 2d 329, 342, 385 N.E.2d 671, 676; *People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, 1320.) As the Supreme Court explained in *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789:

> "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (Emphasis in original.)

In *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277, our supreme court applied this standard to Illinois cases.

Defendant's basic assertion is that he falsely confessed to the offense. He believes his confessions are the result of being manipulated by Penman, his immature behavior, and his drug-induced suggestible condition. He seems to suggest that his confession has become accepted and internalized by himself, which explains why he is still confessing to the crime over three years after his dealings with Penman. He believes his position is borne out by the fact his confessions contain inconsistencies amongst themselves, and are, at times, inconsistent with some of the physical evidence.

█ Initially, we note there is little evidence to support this position. There is no evidence, psychological or otherwise, which would suggest that defendant is susceptible to this occurring. The evidence does establish defendant was in special education in school, acted immaturely for his age, and ingested large amounts of alcohol and drugs. It also establishes Penman attempted to play on his fears and affections during the taped conversations. However, it is a far leap in logic to find that these factors alone would lead defendant to convince himself that he has, in fact, committed the crime, and to so internalize this belief that he was still confessing three years later. Further, this theory fails to explain several critical pieces of evidence.

First, it is clear that on June 11, 1979, defendant initiated contact with the Youth Services Bureau and Penman. He stated he looked a lot like the composite, and asked if Penman thought he could have shot T.M. The next day, he called over 100 times. He, at times, threatened Penman and, ultimately, told her he had committed the murder. This latter comment was overheard by Quick. All this took place prior to the taped conversations when Penman supposedly induced defendant to falsely confess. It is also apparent that he was the first one to broach the possibility that he killed T.M.

Secondly, defendant's theory fails to explain his particular knowl-

edge about the incident. Defendant repeatedly stated that, after the shooting, he fled south across the backyard of the first house and down the alley. Ebel testified that shortly after the gunshot, he saw someone, whose description defendant generally matched, fleeing along that direction. Defendant also stated he remembered being in the Kroger parking lot. Goff saw someone, again with the same general description as defendant, wearing a .22 caliber weapon in the Kroger lot about 25 minutes before the shooting. Finally, defendant, an admitted gun fan, stated repeatedly that he used a .22 caliber revolver. This also fits the evidence since no spent cartridge was found at the scene.

Defendant argues that any knowledge of the incident he has is gained from the police or news sources. Yet, the testimony of all the police officers is that defendant volunteered all the information. A review of the news stories placed into evidence also establishes that they contained no reference to the perpetrator's flight path, the sighting at Kroger, or what type of .22 caliber weapon was used. Thus, the jury could reasonably conclude this knowledge is only available to the murderer of T.M.

Finally, defendant's theory fails to explain why on September 9, 1982, he gave a written statement to Daley, indicating he was speaking on the phone with Penman on the night of the shooting, an alibi which is clearly false and suggestive of criminal knowledge. He also repeatedly called Daley that summer and offered to help solve the crime. These efforts to divert police attention from himself do not fit with the proposed description of a misguided youth who has had a false confession planted in his mind and feels compelled to so confess.

Defendant points to inconsistencies between his confessions and the evidence, as establishing that his confessions are false. For example, he argues his statement indicated he was four to six feet from T.M. at the time of the shooting, and the expert testimony was that he could have been, at most, two feet away. However, the difference could be explained simply by errors in estimating distances. Further, it is clear defendant was under the influence of drugs at the time of the shooting. In several statements, he appeared to be remembering as if in a fog. The jury could have reasonably determined that this particular inconsistency, as well as the others defendant relies on, is due to the drug effects and is not important.

Thus, it is our determination, applying the principles of *Jackson*, that the State has met its burden and proved defendant guilty beyond a reasonable doubt.

Defendant next contends the court erred in conducting the jury

*voir dire.* Prior to trial, he requested that any prospective juror who stated he had knowledge of the case through the media be individually *voir dired* to ascertain the extent of that knowledge. The court declined.

▪ The trial court may, at its discretion, conduct individual *voir dire*, out of the presence of other jurors, but it is not required to do so. (*People v. Neal* (1985), 111 Ill. 2d 180, 197-98, 489 N.E.2d 845, 852, *cert. denied* (1986), 476 U.S. 1165, 90 L. Ed. 2d 733, 106 S. Ct. 2292.) Defendant asserts this discretion was abused. He believes individual *voir dire* was necessary to determine if the jurors were aware he had previously been convicted of this offense. He believes, relying on several out-of-jurisdiction cases, that such knowledge should automatically result in dismissal of the prospective jurors for cause. (See *United States v. Williams* (5th Cir. 1978), 568 F.2d 464; *Barker v. Virginia* (1985), 230 Va. 370, 337 S.E.2d 729; *Hughes v. Delaware* (Del. 1985), 490 A.2d 1034; *Cappadona v. State* (Fla. App. 1986), 495 So. 2d 1207.) However, this is not the law in Illinois.

▪▪ In Illinois, the determination to be made is whether the jury is fair and impartial and will decide the case based on the evidence presented during the trial, and not on the basis of information received from outside sources. (*People v. Taylor* (1984), 101 Ill. 2d 377, 386, 462 N.E.2d 478, 482.) However, knowledge of the case will not itself disqualify one for jury service. (*People v. Gendron* (1968), 41 Ill. 2d 351, 355, 243 N.E.2d 208, 211.) As our supreme court explained:

> "It is not necessary that jurors be unaware of the case before they assume their roles in the jury box. Crimes, especially heinous crimes, are of great public interest and are extensively reported. It is unreasonable to expect that individuals of average intelligence and at least average interest in their community would not have heard of any of the cases which they are called upon to judge in court. Total ignorance of the case is exceptional, and it is not required. (*Irvin v. Dowd* (1961), 366 U.S. 717, 722-23, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, 1642-43.) What is required is the assurance that a juror will be able to set aside all information he has acquired outside the courtroom, along with any opinions he has formed, and decide the case strictly on the evidence as presented in the courtroom. *Irvin v. Dowd* (1961), 366 U.S. 717, 723, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, 1643." (*Taylor*, 101 Ill. 2d at 386, 462 N.E.2d at 482.)

The determination of whether a prospective juror possesses the state of mind which will enable him to give the accused a fair and impartial

trial rests within the sound discretion of the trial court. (*People v. Thomas* (1980), 89 Ill. App. 3d 592, 599, 411 N.E.2d 1076, 1082; *People v. Singletary* (1979), 73 Ill. App. 3d 239, 246, 391 N.E.2d 440, 446.) This determination should not be set aside unless it is against the manifest weight of the evidence. *People v. Cole* (1973), 54 Ill. 2d 401, 414, 298 N.E.2d 705, 712.

In the present case, defendant points to extensive pretrial publicity of his case. As evidence of this, he filed 36 newspaper articles with the court. Of these, all but five were published in 1986 or earlier. Four of those five were written in May 1987 during defendant's second trial, which ended with a mistrial. This was over eight months prior to the current trial. Periods of four months and six months between the questioned publicity and the trial have been held a sufficient period of time to dissipate any unfavorable effect from the publicity, or to reduce it to unimportance. (See *Gendron*, 41 Ill. 2d at 355-56, 243 N.E.2d at 212; *People v. Berry* (1967), 37 Ill. 2d 329, 332, 226 N.E.2d 591, 593.) Thus, the sole article which could impact the jury is the one published on the day of jury selection. This article was on page 13 of the newspaper and was a straightforward news piece on the history of this case. It was neither flamboyant nor inflammatory.

Of the prospective jurors, almost all had heard of this case through various news sources. Of the 12 selected, 7 had heard of the case quite some time before the trial. Five had seen the questioned article in the paper. Of these five, two glanced or skimmed the article, and a third could not remember what he had read. Defendant challenged only three of these for cause and still had peremptory challenges left when the jury was seated. All the jurors indicated they had no preconceived notions on defendant's guilt or innocence; they could be fair and impartial; and they could determine the case based only on the evidence presented at trial. The record establishes defendant received a trial before a fair and impartial jury, and we, therefore, find no abuse of discretion in the court's *voir dire* procedure.

Defendant next argues the court erred by failing to suppress the testimony of Quick concerning what he overheard in the telephone conversation between Penman and himself. He believes Quick violated the eavesdropping provisions of the Criminal Code (Ill. Rev. Stat. 1987, ch. 38, pars. 14—1 through 14—9). A person commits eavesdropping if he uses "an eavesdropping device" to hear a conversation without either the consent of all the parties to the conversation or a court order. (Ill. Rev. Stat. 1987, ch. 38, par. 14—2.) Any evidence obtained in such fashion is inadmissible in a criminal trial. Ill. Rev. Stat.

1987, ch. 38, par. 14—5.

It is apparent Quick did not have a court order, nor defendant's permission. Thus, if Quick used "an eavesdropping device" to overhear the conversation, then the evidence should have been suppressed. In overhearing the conversation, Quick listened on an extension phone and placed his hand over the mouthpiece.

■ It is settled that an extension phone is not an eavesdropping device unless it has been functionally altered. (*People v. Gervasi* (1982), 89 Ill. 2d 522, 526, 434 N.E.2d 1112, 1114; *People v. Gaines* (1981), 88 Ill. 2d 342, 363, 430 N.E.2d 1046, 1056.) Defendant argues Quick, by placing his hand over the mouthpiece, did functionally alter the extension. Our supreme court recently addressed this exact question in *People v. Shinkle* (1989), 128 Ill. 2d 480, and, determining this conduct did not turn an extension phone into an eavesdropping device, affirmed the admission of the overheard evidence.

■ Defendant finally contends he was denied a fair trial by improper prosecutorial closing argument. He cites to two specific incidents. One was not objected to at the time, nor contained in the posttrial motion and is, therefore, waived. (See *People v. Jackson* (1981), 84 Ill. 2d 350, 359, 418 N.E.2d 739, 743.) The other occurred in the following exchange:

"[PROSECUTOR]: Previously [defendant] had said he had been four to six feet away, but this time with Charles Pennell kneeling or squatting he places his finger near or at the right shoulder of Charles Pennell, and this is consistent with what Dr. Grant Johnson said about the shot occurring not at muzzle length to at least two or three inches away but not more than two to three feet.

Remember, during this time of the murder John Britz told everyone he was on PCP.

Now, remember what—use your common sense. What were some of the things that PCP could possibly do to you? Maybe it's some disorientation—.

[DEFENSE COUNSEL]: Objection. There is no evidence on this.

[PROSECUTOR]: It's argument, Judge.

[COURT]: You may proceed.

[PROSECUTOR]: Possibly depth perception, things such as this.

Using your common sense, determine what PCP does as far as the range when these comments were made."

Defendant believes this argument is improper because the prose-

cutor is introducing facts not in evidence. It is improper for a prose-cutor to argue facts not in evidence. (*People v. Johnson* (1987), 119 Ill. 2d 119, 143, 518 N.E.2d 100, 111, *cert. denied* (1988), 486 U.S. 1047, 100 L. Ed. 2d 629, 108 S. Ct. 2027.) However, it is perfectly permissible for counsel to base his argument on the facts proved and the legitimate inferences drawn therefrom. *Johnson*, 119 Ill. 2d at 143, 518 N.E.2d at 111; *People v. Burnett* (1963), 27 Ill. 2d 510, 517, 190 N.E.2d 338, 342.

■■■ The questioned argument is properly based on the trial evidence and inferences drawn therefrom. Defendant repeatedly told people he was "messed up" on PCP and had difficulty remembering what happened. It is a reasonable inference that the use of PCP could affect defendant's ability to remember specific distances. Further, even if the remark was improper, such remarks generally do not constitute reversible error unless they result in substantial prejudice to the accused. (*Johnson*, 119 Ill. 2d at 139-40, 518 N.E.2d at 109-10.) As noted earlier, we do not view the discrepancy between "four to six feet" and "at most two feet" to be such a discrepancy as would, in this case, create a reasonable doubt as to defendant's guilt. Accordingly, any error in argument on this point would not substantially prejudice defendant.

Affirmed.

McCULLOUGH, P.J., and GREEN, J., concur.